**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEDRA DE LA ROSA,<br><br>                                *Plaintiff*,<br><br>vs.<br><br>597 BROADWAY DEVELOPMENT CORP.<br><br>                                *Defendant.* | ECF Case<br><br>No. 13-CIV-7999 (LAK) (MHD) |

**DEFENDANT'S STATEMENT, PURSUANT TO LOCAL
CIVIL RULE 56.1, OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED**

Pursuant to Local Civil Rule 56. 1, and in support of its motion for summary judgment dismissing in its entirety the Amended Complaint of Plaintiff Dedra De La Rosa ("Plaintiff"), Defendant 597 Broadway Development Corp. ("Defendant") states that the following material facts are not in dispute:

1.    The building located at 597 Broadway, New York, New York (the "Building") was built in 1867. Declaration of Tom Van den Bout ("Van den Bout Decl."), ¶ 8, and Exh. B at pages 49-50.

2.    The Building lies within the SoHo-Cast Iron Historic District, which was designated a Historic District by the New York City Landmarks Preservation Commission in August 1973. Van den Bout Decl. ¶ 8, and Exh. B at page 177.

3.    Defendant is the owner of condominium unit 1B at 597 Broadway, New York, New York. Declaration of Richard Benenson ("Benenson Decl.") ¶ 1.

4. The entry door to the Billabong store that occupies unit 1B is approximately 15.5 to 16 inches higher than the adjoining sidewalk. There are two steps of approximately 8 inches each. Van den Bout Decl. ¶ 9; Deposition Transcript of Jimmy Zuehl ("Zuehl Tr.") 29.

**The Landlord's Installation Of A Portable Wheelchair Ramp in 2012**

5. As part of the settlement of a prior ADA action against the Landlord in this District entitled *Zoltan Hirsch v. Billabong USA Holding Pty Ltd.*, No. 12 Civ. 0868 (ALC), the Landlord installed a portable wheelchair ramp to provide wheelchair access to the Billabong store. Declaration of Elizabeth Wolstein ("Wolstein Decl.") ¶¶ 2-4; Benenson Decl. ¶ 3, and Exh. A.

6. In the store window is a sign with the international symbol of accessibility alerting the public that the store is wheelchair accessible. The sign says "ring bell for assistance." Benenson Decl. ¶ 4, and Exh. B.

7. The bell, which is wireless, is attached to a column abutting the sidewalk in a position that can be reached by someone sitting in a wheelchair. Benenson Decl. ¶ 4, and Exh. B.

8. When someone pushes the bell outside, the chime rings loudly inside the store to alert store personnel that there may be someone wishing to use the ramp to enter the store. The Landlord tested the system to make sure it works and to make sure the chime is loud enough to be heard. Benenson Decl. ¶ 5, and Exh. C.

9. When the bell is rung, a store employee is made available to assist the wheelchair user in using the ramp to enter and exit the store. Benenson Decl. ¶ 5.

10. Plaintiff has never tried to enter the store by using the portable ramp. Deposition Transcript of Dedra de la Rosa ("de la Rosa Tr.") 70 (Wolstein Decl., Exh. 8).

**The Permitting Process**

11.     The New York City Department of Buildings ("DOB") reviews all proposed construction in the City for compliance with the New York City Building Code, the New York City Fire Code, and the Americans With Disabilities Act.  Van den Bout Decl. ¶ 10.

12.     Installation of a wheelchair ramp or wheelchair lift at 597 Broadway would require a permit from DOB.  Van den Bout Decl. ¶ 10.

13.     The New York City Landmarks Preservation Commission ("LPC") must approve any alteration to the storefront façade, steps, and landing surrounding the entry to unit 1B, including any wheelchair ramp or lift, because the Building is within a landmarked district.  Van den Bout Decl. ¶ 10.

14.     To apply for a permit for a project requiring LPC approval, the applicant must first submit an application to DOB for a permit, along with an architectural drawing of the proposed construction.  Van den Bout Decl. ¶ 11.  DOB can either issue an approval or raise objections to aspects of the proposed project that do not comply with the Building Code, the Fire Code or the disability laws.  *Id*. ¶ 11.

15.     If DOB has objections to the design, it issues a Notice of Objections to the applicant.  *Id*. ¶ 11.

16.     If the objections can be addressed, the applicant may revise its architectural drawings to address the objection, and submit the revised project to DOB.  *Id*. ¶ 11.  If DOB has additional objections, it issues another objection sheet.  *Id*.

17.     This process continues until the applicant has addressed all of DOB's objections.  *Id*.  Once DOB has no more objections, it issues a clean objection sheet.  *Id*.

18. For smaller projects LPC will not consider the project until DOB has issued a clean objection sheet for the project (with the exception of the objection associated with not having obtained a Landmark Permit).  Van den Bout Decl. ¶ 12.

19. Once the applicant submits the clean objection sheet to LPC, the project is examined by a staff level reviewer.  *Id*.  If the project involves only minor changes that do not affect the historically significant aspects of the property, the project may be approved at the LPC staff level, without the need for a public hearing.  *Id*.

20. If the project would affect the property's historically significant elements, the project must go to an LPC public hearing.  *Id*. ¶ 12.

21. An application to install a wheelchair ramp or lift at 597 Broadway would have to go to a full LPC public hearing process.  *Id*. ¶ 12.

22. The LPC approval process associated with a full hearing consists of staff level review, a community board hearing, and finally a hearing before the LPC itself.  Initially, the applicant reviews its design with the LPC staff until the assigned staff member believes the design satisfactorily meets the requirements for presentation before the public and the Commission.  Van den Bout Decl. ¶ 13.

23. The applicant must then appear for a public hearing before the New York City Community Board for the area in which the project is located.  *Id*.  At that point, the Community Board can either approve or reject the project.  The Community Board's determination is purely advisory to the Commission, but in practice carries significant weight with the commissioners' review of the proposal.  *Id*.

24. The applicant must then present its proposal at a public hearing before the Commissioners of the LPC, at which members of the public can also speak.  *Id*.

25.	The Community Board's statement is read into the record along with those of any other city preservation groups, local community groups and/or individuals.  *Id*.

26.	The LPC Commissioners review the proposal to determine its effect on the historically significant features of the property, and, for buildings that are within historic districts, its effect on nearby designated properties and/or the character of the district in general. *Id*.

27.	The Commissioners then vote on the proposal and either approve, request specific alterations (to be presented again in a subsequent Public Meeting, or worked out with preservation staff), or reject the project.  *Id*.

28.	The Commission tends not to approve dramatic alterations of historically significant features of landmarked properties that are not appropriate to the character of the building and/or the district.  Van den Bout Decl. ¶ 14.  When applications proposing dramatic alterations of historic features are submitted, there is often significant push back at the staff level, instructing the applicant to revise design so as not to significantly alter the historic features of the property.  *Id.*  The Commission will not approve a project it feels is historically inappropriate. *Id.*

## DOB's Denial Of The Landlord's Application For Approval Of A Permanent Wheelchair Ramp

29.	In July 2014, the Landlord applied for a permit to build a wheelchair ramp leading into the Billabong store.  The application included Mr. Van den Bout's ramp design.  Van den Bout Decl. ¶ 16, and Exh. D.

30.	On August 6, 2014, DOB issued a Notice of Objections in response to the Landlord's permit application.  Van den Bout Decl. ¶ 19, and Exh. E.

31. DOB objected to the ramp because it extends out onto the sidewalk more than 44 inches, and stated that such a design violates the Building Code. Van den Bout Decl. ¶ 19, and Exh. E.

32. The Landlord's proposed ramp also partially covered a manhole. Van den Bout Decl. ¶ 21.

33. There is a standpipe in front of the store window. Van den Bout ¶ 18; Zuehl Tr. 54.

**Defendant's Expert Witness**

34. Only architects (or engineers) who are registered with the State of New York are permitted to sign and seal architectural drawings that are submitted to the New York City Department of Buildings and the Landmarks Preservation Commission. Van den Bout Decl. ¶ 6; Zuehl Tr. 15-16.

35. Mr. Van den Bout is a registered architect and has had his own architecture firm since 1994. Van den Bout Decl. ¶ 3.

36. Approximately 80% of the work of Mr. Van den Bout's firm involves New York City landmarked properties or the process for obtaining LPC approval for work a client wishes to do on a landmarked property. *Id*. ¶ 4.

37. Since founding his firm in 1994, Mr. Van den Bout has been the architect of record for approximately 130 to 150 submissions to the New York City Department of Buildings and approximately 100 submissions to the New York City Landmarks Preservation Commission seeking permits for work clients wish to perform. *Id*. ¶ 5.

**Plaintiff's Expert Witness**

38. Plaintiff's expert architect, Mr. Zuehl, is not a registered architect in any state. Zuehl Tr. 14.

39. Mr. Zuehl is not qualified to sign and seal drawings in New York state. Zuehl Tr. 15.

40. Mr. Zuehl is not qualified to submit a permit application to DOB or to LPC as the architect of record. Zuehl Tr. 15-16.

41. Mr. Zuehl has never submitted a permit application to DOB or to LPC as the architect of record. Zuehl Tr. 16.

**Plaintiff's Proposed Ramps**

42. The two ramps designed by Plaintiff's expert, Jimmy Zuehl, for this case ("Plaintiff's Proposed Ramps") do not have handrails. Zuehl Tr. 34, 39; Van den Bout Decl. ¶ 23, and Exhs. F and G.

43. The slope of Plaintiff's Proposed Ramps is 13%. Zuehl Tr. 32, 39; van den Bout Decl. ¶ 23, and Exhs. F and G.

44. Plaintiff's Proposed Ramps do not have a landing at the top of the ramp. Zuehl Tr. 34, 39; Van den Bout Decl. ¶ 23, and Exhs. F and G.

45. Plaintiffs Proposed Ramps do not comply with the 2010 ADA Standards for Accessible Design. Zuehl Tr. 45.

46. Plaintiff's Proposed Ramps have a left "flair" that extends onto the sidewalk in front of the neighboring property to the south. Zuehl Tr. 33; Van den Bout Decl. ¶ 27.

47. The Landlord on its own cannot obtain a DOB permit to build onto the sidewalk in front of a neighboring property it does not own. Van den Bout Decl. ¶ 27.

7

48. The only difference between Plaintiff's second ramp sketch (van den Bout Decl. Exh. G), submitted in her second expert report dated September 29, 2014, and her first ramp sketch (van den Bout Decl. Exh. F) is that the second ramp extends out 44 inches rather than 48 inches from the street line.  Zuehl Tr. 38.

49. Plaintiff's Proposed Ramps would require removal of the two steps leading into the Billabong store.  Zuehl Tr. 39; van den Bout Decl. ¶ 28.

**Plaintiff's Proposed Wheelchair Lifts**

50. Plaintiff's proposed designs for a wheelchair lift ("Plaintiff's Proposed Lifts") (Exhibits H and I to Van den Bout Declaration) "assume" that all the necessary permits would be granted to build either of the lifts.  Zuehl Tr. 46-47, 51.

51. Mr. Zuehl's drawings of Plaintiff's Proposed Lifts were only "conceptual sketches."  Zeuhl Tr. 52.

52. Any number of dimensions of Plaintiff's Proposed Lifts could change between the designs submitted by Mr. Zuehl and the final drawings.  Zuehl Tr. 60.

53. Mr. Zuehl does not know the weight of Plaintiff's Proposed Lifts.  Zuehl Tr. 61.

54. Mr. Zuehl cannot say whether the railing for the lifts would be mounted "on the steps or if they would be on the actual finished floor ground level below."  Zeuhl Tr. 61.

55. Mr. Zuehl cannot say whether the stairs to the store can support the lift.  Zeuhl Tr. 62, 64.

56. Mr. Zuehl does not know where the mounting posts would go that would mount the railing for Plaintiff's Proposed Lifts.  Zeuhl Tr. 65.

57. Mr. Zuehl cannot say how the lifts would be attached to the storefront because those issues are not within his expertise.  Zuehl Tr. 66.

58. Mr. Zeuhl does not know whether the mounting brackets in his sketch would hold the weight of the rail or the lift.  Zuehl Tr. 67.

59. The placement of the mounting brackets could change in the final design of Plaintiff's Proposed Lifts.  Zuehl Tr. 84.

60. The designs for Plaintiff's Proposed Lifts alter the historic configuration of the 597 Broadway storefront.  Van den Bout Decl. ¶ 32.  For example, the display window at the top of the steps would be almost completely blocked when the lift is closed.  *Id*.

61. Some kind of support would have to be inserted in order to support the lift.  *Id.*

62. In the drawings of Plaintiff's Proposed Lifts, access to the left standpipe is blocked by the lift.  Van den Bout ¶ 33.

63. In Mr. Zuehl's revised lift drawing (Exhibit I to Van den Bout Decl.) the Fire Department could not freely access the left side opening on the standpipe to attach a hose.  *Id*. ¶ 33.

Dated:  New York, New York
        November 21, 2014

                                               **SCHLAM STONE & DOLAN LLP**

                              By:    / Elizabeth Wolstein
                                     Richard H. Dolan
                                     Elizabeth Wolstein
                                     26 Broadway
                                     New York, New York 10004
                                     Tel.:  (212) 344-5400
                                     Fax:   (212) 344-7677
                                     ewolstein@schlamstone.com

                                     *Attorneys for Defendant*
                                     *597 Broadway Development Corp.*