UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEDRA DE LA ROSA, | ECF Case |
| *Plaintiff,* | |
| vs. | No. 13-CIV-7999 (LAK) (MHD) |
| 597 BROADWAY DEVELOPMENT CORP., | |
| *Defendant.* | |

**DECLARATION OF RICHARD BENENSON
IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION**

Pursuant to 28 U.S.C. § 1746, Richard Benenson, declares, under penalty of perjury, that the following is true and correct:

1. I am the managing agent for defendant 597 Broadway Development Corp. (the "Owner" or "Defendant"), owner of condominium unit 1B at 597 Broadway, New York, New York. I previously submitted a declaration ("Moving Declaration"), in support of the Owner's summary judgment motion. My responsibilities as managing agent are described in that declaration and incorporated by reference here. For convenience, a copy of my Moving Declaration, with exhibits, is attached hereto as Exhibit A. The statements in this declaration are based on my personal knowledge.

2. 597 Broadway was converted to a condominium in 1988. I was intimately involved in the conversion process. I worked with the lawyers on allocation of the Common Elements as defined in the Declaration Establishing Plan for Condominium Ownership of 597 Broadway, dated November 30, 1988 (the "Declaration"). I was also the broker for the sales of the units, which prior to the conversion were occupied by renters. And because I had been the

managing agent of the building before the conversion, I received a contract to be the managing agent for the new Condominium Association. I am no longer managing agent for the Association and now am managing agent only for 597 Broadway Development Corp., owner of Unit 1B, the ground floor commercial unit that is now occupied by a Billabong store. A true copy of the Declaration is attached hereto as Exhibit B.

3. The Condominium Association that was formed with the conversion became the owner of the "Common Elements" in the Building. The Common Elements are portions of the building available for use by or used by all the unit owners, as opposed to the owner of a particular unit. As such they are not owned by any particular unit owner, but are owned by the Condominium Association and maintained on behalf of all the unit owners.

4. The wall between 597 Broadway and 595 Broadway is identified in the Declaration as a party wall and falls within the definition of the "Common Elements" of the condominium as defined in the Declaration. The Declaration also states that the Common Elements within the commercial units, of which unit 1B is one, "shall not be considered part of such Unit." Exh. B at Art. 2, Art. 4.1, and Art. 5.2-2 and 5.2-3.

5. As a result, the party wall between 597 Broadway and 595 Broadway (the "Party Wall") is not owned by Defendant and would not be owned by any person or entity that owns unit 1B.

6. Defendant does not own, have any ownership interest in, operate, or control the Building at 595 Broadway or the ground floor commercial space within that building.

7. When Kenneth Cole sought to cut openings in the Party Wall in 2000 to join its two leased spaces, one at 597 and one at 595 Broadway, into a single store, the Condominium Association's consent was required, because the Association is the owner of the Party Wall. The

Association's ownership is reflected in the first Whereas clause in the September 12, 2000 Party Wall Agreement (the "Party Wall Agreement"), a true copy of which is attached hereto as Exhibit C.  If the Condominium Association did not agree, or the owner of 595 Broadway did not agree, Kenneth Cole would not have been permitted to cut the openings.  Conversely, the holes in the wall could not be left open after Kenneth Cole vacated the space if the Condominium Association and the owner of 595 Broadway did not agree to leaving them open.

8.      It was essential to obtaining the consent of all the parties that Kenneth Cole was going to operate a single store occupying both spaces.  Neither the Association nor the Owner would not have tolerated having holes in the Party Wall if the two adjoining stores were rented by different and unrelated tenants.  Also it is highly unlikely that any commercial tenant would even be willing to rent a space that was open to the neighboring store.  I have been in the real estate business for over 30 years as a developer, landlord, managing agent, and licensed broker and find such a scenario unimaginable, for reasons that would seem obvious.

9.      At some point in 2008, Kenneth Cole approached me and the Owner about breaking its lease, which was to end on January 31, 2014.  The Owner subsequently agreed.  Even if the Owner had not agreed, the tenant could have ceased paying rent and unilaterally vacated the space.  This is not uncommon with commercial tenants whose business at the location is no longer profitable and they cannot afford the rent.   The Owner had no ability to prevent Cole (or any tenant) from vacating the premises and ceasing to pay rent.  If that were to happen, the Owner could sue the tenant for breach of the lease, but would have no self-help remedy to forcibly keep Cole on the premises or forcibly extract the monthly rent.

Executed, New York, New York, December 19, 2014

*Richard Benenson*_____
Richard Benenson

4