UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEDRA DE LA ROSA,<br><br>*Plaintiff,*<br><br>vs.<br><br>597 BROADWAY DEVELOPMENT CORP.<br><br>*Defendant.* | ECF Case<br><br>No. 13-CIV-7999 (LAK) (MHD)<br><br>DECLARATION OF<br>TOM VAN DEN BOUT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

Pursuant to 28 U.S.C. § 1746, Tom van den Bout, declares, under penalty of perjury, that the following is true and correct:

1. I am a registered architect licensed to practice architecture by the states of New York, New Jersey, Connecticut, Vermont, and Virginia. I previously submitted a declaration ("Moving Declaration"), in support of the summary judgment motion of defendant 597 Broadway Development Corp. (the "Owner" or "Defendant"). My qualifications and experience are described in that declaration and incorporated by reference here. For convenience, a copy of my Moving Declaration, with exhibits, is attached hereto as Exhibit 1. The statements in this Declaration are based on personal knowledge and my professional opinion.

2. The purpose of this Declaration is to explain why there would be no purpose to meeting with the Department of Buildings (DOB) to discuss its objections to my ramp design, and why in my professional opinion there is virtually no chance that the New York City Department of Transportation (DOT) would issue a revocable consent allowing the Owner to build the ramp I designed and submitted to DOB.

**How Meetings With The Department of Buildings Work**

3. If the Department of Buildings (DOB) issues objections to a project, the applicant can seek to discuss the issues with DOB. The purpose is not to have DOB provide input into how the project could be changed so as to secure DOB approval. There are essentially three reasons an applicant would request a meeting with DOB to discuss a notice of objections: first, to explain that the agency has misunderstood its drawing and in fact there is no issue, second, to explain that the agency has incorrectly applied provisions of the Building Code and in fact there is no issue, or third to come back with a change to the design that addresses the issue. In the 130-150 times I have submitted permit applications to DOB, I have never once had a follow up meeting in which DOB was attempting to help me redesign my submission or assist in resolving objections it had issued. Rather, DOB identifies problems and it is the applicant's responsibility to come up with a fix or redesign.

4. Sometimes a redesign to cure DOB's objections is not feasible. It is not the case that anyone who meets with DOB after receiving a notice of objections can simply meet with DOB and have its project approved. If there is no way to redesign the project to cure DOB's objections, there is, in my experience and opinion, no reason to seek to meet with the agency staff to discuss the objections.

5. In this case, DOB did not misunderstand my ramp design in making its objections, nor did it make any mistake in applying the Building Code. The Code issues cited by DOB—that the ramp extends more than 44 inches and lacks handrails as required by the ADA—are present in my design. As I explained in my Moving Declaration, in order to meet ADA technical and design standards, the ramp has to extend well beyond the 44-inch limit.

6. More specifically, the reach of the ramp onto the sidewalk more than halfway to the street results from applying the ADA's sloping requirements to the steps to be ramped, which rise fully 15.5 to 16 inches from the sidewalk. With a rise of this height, the maximum slope permitted under the ADA 2010 Design Standards is 10 inches of ramp for every one inch of rise—for a total of 155-160 inches of ramp. To meet the 2010 Standards, the ramp had to therefore be designed as switchback ramp. Given the height of the steps and the ADA slope requirements, it is physically impossible to create an ADA-compliant ramp that extends no more than 44 inches out from the storefront.

7. To add ADA-compliant handrails as required under the Building Code and the ADA would make the ramp extend even further out into the sidewalk.

8. Thus, there is no viable re-design of an ADA-compliant ramp that could cure DOB's principal objection that the ramp violates the Building Code by extending more than 44 inches beyond the property line. Any ADA-compliant ramp would necessarily extend well beyond the 44-inch limit. Given this, there would be no purpose to seeking to meet with DOB to discuss this DOB objection—since it cannot be resolved.

9. Beyond that, going through the motions of meeting with DOB would do nothing to address the landmarks issues presented by the ramp. Although DOB is aware of the need for approval of changes to landmarked buildings or buildings in landmarked districts, it does not

have jurisdiction to review and approve such changes; only the Landmarks Preservation Commission (LPC) does. Thus DOB typically does not identify landmarks-related objections that are the LPC's to identify and enforce. For the reasons I explained in my Moving Declaration, my ramp is highly unlikely to be approved by the LPC for reasons independent of the Building Code violations. A meeting with DOB would serve no purpose (other than to create the appearance of doing something) for this additional reason.

**Why The Issuance Of A Revocable Consent Is Highly Unlikely**

10. I described a revocable consent in my Moving Declaration and will not repeat the description here, but will focus on why I believe there is virtually no chance that DOT would grant a revocable consent for an ADA-compliant ramp given its size and the hazards it would pose to the heavy pedestrian traffic on the block where 597 Broadway is located.

11. As explained in my Moving Declaration, he necessary 155-160 inches of ramp requires a switchback ramp that extends nearly 10 feet from the property line. The ADA-compliant handrails that would have to be added as noted on DOB's objection sheet would extend the ramp even further across the sidewalk toward the curb. Ten fee

12. A ramp of these dimensions would create a hazard for pedestrians, cover MTA sidewalk vaults, and cover a manhole.

13. Building owners do not have jurisdiction over manholes. I have never submitted a design for a permit that calls for covering a manhole, and to my understanding manholes need to remain accessible so they can remain active and in use for whatever system they service. An ADA-compliant ramp of the necessary length will always cover the manhole. As with the 44-inch rule, there is no way to cure this problem because of the length of ramp required to create an ADA-compliant ramp for steps that rise 16 inches.

14. MTA sidewalk vaults lie beneath the sidewalk immediately in front of the subject property. These vaults have large steel gratings flush with the sidewalk that allow fresh air into the track system below Broadway. It cannot be assumed that blocking of these grates would be permitted.

15. Most importantly, a ramp extending onto the sidewalk more than halfway from the storefront to the street poses a hazard to pedestrians, particularly when the crowds on the sidewalk are as heavy as they are on this block. Obstructions of this scope are never permitted for obvious reasons of life safety – they force pedestrians into the roadway. This ramp would also create a tripping hazard. I do not believe I have ever seen a wheelchair ramp in Manhattan or Brooklyn, the two boroughs I know best, that extends more than halfway from the storefront to the street on a sidewalk that is heavily trafficked, or on any sidewalk for that matter.

16. In my professional opinion, these problems mean there is virtually no chance a revocable consent would be granted by DOT for an ADA-compliant wheelchair ramp.

17. The two times I have submitted applications to DOT for revocable consents as the architect of record (both of which were granted) the issues were nothing like the extensive blocking of the sidewalk that would be necessary to accommodate an ADA-compliant ramp into 597 Broadway. The first was a steel hatchway flush to the sidewalk that gives access to the associated building's cellar. It is the standard size and detail that appears in much of New York City's older brownstone-scale buildings. Historic photos of the previous building showed a similar sidewalk hatch. The hatchway I submitted for approval did not encroach onto the sidewalk at all. The second was for a front stoop that extended beyond the front property line of a new townhouse. This also did not encroach onto the sidewalk at all. As is common within many historic New York neighborhoods, the property line sits within the front garden and

sometimes half way up the front stoop, as opposed to being located at the garden fence or face of the building. The proposed stoop was granted a revocable consent because it did not in any way infringe on the sidewalk, and it lined up with neighboring properties and established a contiguous fence and garden line. Both of these are good examples of revocable consents granted and the minimal impact they have on the streetscape. In contrast, the proposed ramp obstructs city infrastructure and significantly obstructs a public way, and in my professional opinion is not feasible at this location.

Executed: New York, New York, December 18, 2014

_____
Tom van den Bout