UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEDRA DE LA ROSA,

                Plaintiff,

**REPORT & RECOMMENDATION**

          -against-

13cv7999 (LAK)(MHD)

597 BROADWAY DEVELOPMENT CORP. et al.

                Defendants.

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

Plaintiff Dedra de la Rosa, who is wheelchair-bound,
commenced this lawsuit under Title III of the Americans with
Disabilities Act ("ADA") and parallel New York State and City
laws. She seeks to challenge the adequacy of access to a
commercial establishment located at 597 Broadway, in Manhattan.
Following the voluntary dismissal of all of plaintiff's claims
except those seeking declaratory and injunctive relief to
improve access from the street into the ground-floor commercial
unit, the remaining dispute centers on whether the availability
of a temporary ramp to surmount the steps at the front of the
unit is legally sufficient.

1

With discovery complete, plaintiff and the remaining defendant -- 597 Broadway Development Corporation, the owner of the commercial space in question -- have each moved for summary judgment. For the reasons that follow, we recommend that both parties' motions be granted in part and denied in part.

## I.  BACKGROUND

### A. The Relevant Facts

Ms. de la Rosa is a resident of New York City. She suffers from an ailment that confines her to a wheelchair. (Plaintiff's Rule 56.1 Statement ¶ 1)("Pl. 56.1"); Decl. of Glen H. Parker, Esq. in Support of Plaintiff's Motion ("Parker Support Decl.") Ex. 14). She reports that on some occasion within three years before filing this lawsuit, she sought to enter the commercial unit at 597 Broadway, but encountered stairs and no wheelchair ramp, preventing her from accessing the commercial space at that address. (Am. Compl. ¶ 14).

Defendant 597 Broadway is the owner and landlord of the ground-floor commercial unit at that address, a space referred to as condominium unit 1-B. (Decl. of Richard Benenson in

2

Support of Def. Mot. ("Benenson Support Decl.") ¶ 1). The building was constructed in 1867 and lies within the Soho Cast-Iron Historic District. (Decl. of Tom van den Bout in Support of Def. Mot. ("VDB R. 56 Decl.") ¶ 8 & Ex. B).

The entrance to defendant's commercial unit at 597 Broadway is between 15.5 and 16 inches above street grade. (VDB R. 56 Decl. ¶ 9 & Ex. C; Decl. Of Elizabeth Wolstein, Esq. in Support of Def. Mot ("Wolstein Support Decl.") Ex. 10 at 29:12-18). The front door is set back approximately seven feet from the building line, and swings outward. (VDB R. 56 Decl. ¶ 9 & Ex. C). The platform facing the door can be reached by two metal steps, each approximately eight inches high, that rise from the sidewalk. (Id. at Ex. C). Currently, and since approximately 2009, unit 1-B has been occupied under a lease by a store known commercially as Billabong, which is owned by former defendant GSM (Retail), Inc. (Parker Support Decl. Ex. 12 ¶¶ 6,8).

The building immediately adjacent to, and south of, 597 Broadway is 595 Broadway. (Parker Support Decl. Ex 1, 2). It has a ground-floor commercial space that has been occupied throughout the relevant period by a Kenneth Cole outlet. (Parker Support Decl. ¶¶ 7, 30 & Ex. 2, 13). The entrance to that

3

commercial unit is level with the sidewalk, and thus poses no obstacle to a wheelchair-bound patron. (Decl. of Dedra De La Rosa in Support of Pl. Mot. ("DLR Decl.") ¶¶ 1-6).

The commercial unit at 595 Broadway shares a party wall with the 1-B unit at 597 Broadway. (Parker Support Decl. ¶ 6 & Ex. 2). In 2000, Kenneth Cole communicated a desire to expand its commercial space to encompass the 1-B unit at 597 Broadway as well as its pre-existing space at 595 Broadway. Accordingly, in September 2000 Kenneth Cole entered into a lease agreement with defendant 597 Broadway to allow it to rent the space at unit 1-B for a period that would end in 2014, though subject to renewal. (Id. at ¶¶ 6-7, 9-11 & Exs. 2, 15 at 31, 34-36). At the same time Kenneth Cole entered into a party-wall agreement with (1) defendant 597 Broadway, (2) Broadway Mercer Condominium, the condominium association that owns 597 Broadway and (3) 595 Bway Associates, which owns the building at 595 Broadway. Under its terms, Kenneth Cole was authorized, subject to City approval, to open the party wall at three places on the ground floor and three places in the basement, to create "one fully integrated retail store." (Id. at Ex. 2 at 1-2). The party-wall agreement and leases for the soon-to-be-united two units extended until

4

January 31, 2014. (Id. ¶ 5). The planned modifications to the party wall were approved by the New York City Department of Buildings ("DOB") and by the New York City Landmarks Preservation Commission ("LPC") in 2001 and the work was completed in March 2003. (Parker Support Decl. Exs. 3, 4). As part of these alterations, the floors of the two retail spaces were level and joined (id. Ex. 15 at 42:22-43:13), and accordingly by early 2003 a wheelchair-bound person could freely access the 1-B unit at 597 Broadway by entering through the street door at 595 Broadway and traveling through the opened party wall into the adjoining space. (Pl. 56.1 ¶¶ 10, 17-21 & Parker Support Decl. Exs. 1, 2, 5, 15 at 37-43).

Some time after 2006 Kenneth Cole advised 597 Broadway that it wished to surrender its lease on the 1-B unit and limit its retail operations to its original space at 595 Broadway. (Id. Ex. 15 at 47:20-24). Defendant agreed to that early termination of the lease on condition that the lessee restore the party wall to its prior state by closing the openings that had been made in 2001. (Id.). The DOB approved the application to "close existing openings between 597 and 595 Broadway" in March 2009. (Id. Ex. 6). Subsequently Kenneth Cole closed the openings in the party

wall, and as a result the single integrated retail store reverted to being composed of two separate spaces in adjacent buildings with a shared party wall. (Id. at Ex. 15 at 47; Benenson Decl. in Opposition to Pl. Mot. ("Benenson Oppos. Decl.") ¶¶ 8-9). As a result, 597 Broadway once again had an architectural barrier to wheelchair entry -- in the form of the pre-existing two stairs -- and individuals in wheelchairs who desired to enter the commercial space in 597 Broadway no longer had an accessible path to do so. (Parker Support Decl. Exs. 7, 15 at 45-50; Wolstein Support Decl. ¶¶ 2, 4).

597 Broadway was later named as a defendant in an ADA lawsuit that resembled the current litigation. (Wolstein Support Decl. ¶ 2). In 2012 it settled that lawsuit based in part on its agreement to obtain a portable ramp to enable wheelchair-bound individuals to surmount the two steps at the entrance to the premises, which had since been leased to GSM Retail for use as a Billabong store. (Id. at ¶¶ 2-4; Benenson Support Decl. ¶ 3 & Ex. A). As a result, since July 2012 the entrance to 597 Broadway has had a posted sign stating that the premises are wheelchair-accessible and instructing any interested party to "ring bell for assistance". (Benenson Support Decl. ¶¶ 4-5). The

6

doorbell is mounted at a height accessible to an individual in a wheelchair, and when the bell is rung, an employee from Billabong sets up the temporary ramp to enable that individual to enter the store. (Id.).

As noted, plaintiff reports that at some time before she filed suit, she sought to enter unit 1-B at 597 Broadway but encountered the two stairs and was therefore prevented from doing so. (Am. Comp. ¶ 14). There is no indication whether her attempt preceded or postdated the acquisition by defendant of a temporary ramp. Ms. De la Rosa testified that she was unaware of the availability of such a ramp and that in any event she would not have used it because she finds such ramps to be unsafe. (Wolstein Support Decl. Ex. 8 at 70).

Plaintiff commenced this lawsuit in 2013. The complaint alleged that defendant had not done what was required to ensure access to its space despite the architectural barrier of a pair of stairs. (Am. Compl. ¶¶ 13-17). The pleading, however, did not specify what corrective action was required of the defendant. Nonetheless, at conferences in July and September 2014 plaintiff's counsel represented that the sole issue posed by his client's suit was whether defendant was obliged to install a

7

permanent ramp to permit access over the stairs at the front of the unit. (July 18, 2014 Tr. 2:23-3:1; Sept. 16, 2014 Tr. 19:13-16).

In the summer of 2014, in apparent response to the issue as framed by plaintiff, defendant engaged a licensed architect, Mr. Tom van den Bout, to design a permanent ramp for the 597 Broadway storefront that complied with applicable ADA standards and to submit an application embodying this proposal to the DOB. Mr. van den Bout executed such a design, and submitted the application in July 2014. (VDB R. 56 Decl. ¶ 16 & Ex. D). Because of ADA limitations on the slope of a wheelchair ramp and the narrowness of the sidewalk abutting the property, as well as the narrowness of the building, Mr. van den Bout's proposal featured a switchback design for a ramp that extended substantially more than 44 inches from the building line, despite a New York City rule that required extensions onto the sidewalk not to exceed 44 inches from the building line. (Id. at ¶¶ 17-19). See also 28 C.F.R. pt. 36, subpart D § 405.7.4; 36 C.F.R. part 1191, App. C ¶ 4.8; R.N.Y.C. tit. 34 § 7-04(23). In response, the DOB issued a Notice of Objections on August 6, 2014, listing two objections to the proposal. One was for the

8

lack of handrails -- an objection that Mr. van den Bout describes as curable (although at the cost of requiring a still longer ramp) -- and the other was based on the ramp's extension on the sidewalk beyond 44 inches from the building line, a violation that he says is not curable if the ramp is to comply with the ADA requirement that the slope not exceed 1:10. (VDB R. 56 Decl. ¶¶ 19-20 & Ex. E).

Although the issuance by the DOB of a Notice of Objections is not itself a rejection of an application and the applicant may follow up with the DOB's examiners (Parker Support Decl. Ex. 16 at 48:9-51:5), Mr. van den Bout did not do so because he was not instructed by defendant's counsel to pursue the matter further. (Id. Ex. 16 at 146:7-147:4). He also testified that the 44-inch rule may be waived, but that such a waiver is within the sole jurisdiction of the City's Department of Transportation ("DOT") through a mechanism known as a revocable consent. (VDB R. 56 Decl. ¶ 15). Although he has on occasion sought and obtained such a consent from the DOT on other projects, he did not pursue that avenue, again because he was not hired by defendant to do so. (Parker Support Decl. Ex. 16 at 189:13-23). Finally, he noted that a modification such as installation of a

9

ramp attached to the 597 Broadway property would require approval by the LPC, but that the LPC will not act until the DOB confirms that it has no further objections. (VDB R. 56 Decl. ¶ 11). In any event, he testified that he had not contacted the LPC, since he had been asked only to prepare and submit the initial application to the DOB. (Parker Support Decl. Ex. 16 at 146-47).

In defendant's motion its counsel represents that she contacted the LPC. (Wolstein Decl. Support ¶ 10 & Ex. 7). Although she reports that she engaged in a telephone conversation with an LPC representative (id.), defendant has since eschewed any reliance on this contact for purposes of its motion. (Feb. 19, 2015 Tr. 46:22-47: 12).[1]

---

[1] We note in this regard that the statement allegedly made by the LPC representative would appear to be inadmissible hearsay. See Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009)("'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'")(quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)). See also Fed. R. Evid. 801(c)(hearsay is any out-of-court statement made by a declarant other than the one giving testimony and offered in evidence to prove the truth of the matter asserted.). Moreover, if defendant had relied on that conversation, it would have raised the specter of a challenge to counsel's further participation in this lawsuit based on her serving as a fact witness. See, e.g.,

## B. The Procedural History

Plaintiff filed her original complaint on November 8, 2013. Naming as defendants both 597 Broadway and GSM, she asserted six claims to the effect that the ground floor retail space suffered from a variety of architectural impediments to her accessing and utilizing the retail facilities, in violation of federal, state and local laws. (Wolstein Support Decl. Ex. 3). She settled with GSM/Billabong in June 2014 and thereafter amended her complaint to withdraw claims pertaining to her ability to navigate pathways within the Billabong store. (Id. at ¶ 8 & Ex. 4). She also withdrew all claims for damages, leaving only her claims for declaratory and injunctive relief pertaining to access from the street -- claims that arise under Title III of the ADA, 42 U.S.C. §§ 12181 et seq., and its implementing regulations, the New York State Executive Law, § 296, prohibiting discrimination against the disabled, the New York State Civil Rights Law, § 40, and the Administrative Code of the City of New York, § 8-107. (Am. Compl. ¶¶ 46-80).

---

Fulfree v. Manchester, 945 F. Supp. 768, 770 (S.D.N.Y. 1996)(discussing the advocate-witness rule, Canon Five of the Code of Professional Responsibility governing legal practice in the State of New York).

Defendant filed a counterclaim, seeking a declaration that it is in compliance with federal, state and local laws regulating the accessibility of its entrance and that it is not obliged to install a permanent ramp. It also seeks an award of fees and costs. (Answer to Am. Compl. & Counterclaim, Doc. 33, at 13-14 ¶¶ 26-32).

Following the close of discovery, both sides moved for summary judgment on November 21, 2014. Opposition and reply papers followed, and in the wake of oral argument on February 19, 2015, they each proffered supplemental papers on February 25 and 27, 2015, with additional follow-up on June 24 and June 29, 2015.

As part of the relief sought by plaintiff, she asks for an injunction requiring defendant "to initiate a formal process" for seeking permission to install a permanent ramp at the entrance to defendant's retail space. (Notice of Motion, Doc. 40, Nov. 21, 2014). She also seeks dismissal of defendant's counterclaim and a declaratory judgment to the effect that in 2009 defendant made "alterations" to its property within the meaning of applicable Department of Justice ("DOJ") regulations and that, by eliminating wheelchair access, those alterations

12

violated the ADA design guidelines, as well as the City
Administrative Code. (Id.). In substance, she argues that the
closing of the party wall in 2009 amounted to an alteration, and
that it was at least possible for defendant to have undertaken
measures at that time -- and still today -- to ensure access by
wheelchair-bound individuals to the retail space. (Memorandum in
Support of Pl. Mot. ("Pl. Support Mem.") 11-14). She further
asserts that the availability of a temporary ramp is not a
sufficient accommodation under the ADA because a permanent ramp
or some other alternative, such as a wheelchair lift or
reopening of the party wall, is potentially available. (Id. at
20-21).

Defendant contends that the 2009 wall closures did not
amount to an alteration under ADA standards, and that hence it
was not obliged to undertake any alternative beyond a portable
ramp, since plaintiff does not demonstrate that any other
arrangement -- notably a permanent ramp -- was or is "readily
achievable". (Def. Reply Mem. 10-11). In arguing for a lack of
ready achievability, defendant's submissions, relying on its
architect's testimony, assert principally that the relevant
local agencies are highly unlikely to approve any ramp that

13

would be inconsistent with ADA standards or City regulations and that defendant's submission to the DOB demonstrates the implausibility of such a scenario. (See, e.g., Def. Oppos. Mem. 14-16; Def. Response to Pl.'s Supplemental Brief ("Wolstein Feb. 27 Letter") 2-3).

## II.   ANALYSIS

We first summarize the standards generally applicable to summary-judgment motions and then assess the parties' competing applications.

### A. Summary Judgment Standards

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Sec. Ins. Co. Of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004); Overton v. New York State Div. Of Mil. & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004); Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

    The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. Pro. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002).

15

If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; Golden Pac. Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004); PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003). If, however, the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party may not rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. Pro.

16

56(e); see also, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 60 (2d Cir. 2004), nor may it rely on its pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

If both sides move for summary judgment, the court must separately assess the adequacy of each motion. "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Ricci v. DeStefano, 530 F.3d 88, 109-10 (2d Cir. 2008)(quoting Schwabenbauer v. Board of Educ. of Olean, 667 F.2d 305, 314 (2d Cir. 1981)). Thus, if neither movant satisfies its Rule 56 burden, the court

17

must deny both motions. E.g., id. (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1561 (2d Cir. 1993)); Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 524 (S.D.N.Y. 2011).

Finally, even if the court does not grant summary judgment co-extensive with the relief sought by either movant, it may provide partial relief. Moreover, that relief may be as limited as a declaration that one or more material facts are "not genuinely in dispute" and that those facts are deemed "established in the case". Fed. R. Civ. P. 56(g).

## B. Standards Under Title III of the ADA

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). See 28 C.F.R. § 36.201. To prevail on a claim for violation of this provision, the plaintiff must establish (1) that she is disabled within the meaning of the statute and regulations, (2) that the defendant owns, leases or operates a place of public accommodation, and (3) that the defendant

18

discriminated against her on the basis of her disability. See, e.g., Roberts v. Royal Atlantic Corp., 542 F.3d 363, 368 (2d Cir. 2008); Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008). In this case there is no dispute that plaintiff has satisfied the first two of these criteria. What is in dispute is whether she can demonstrate that defendant engaged in prohibited discrimination.

Insofar as pertinent to pre-existing buildings -- that is, structures that pre-date 1993 -- section 302 of the ADA defines "discrimination" to encompass "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable . . . " 42 U.S.C. § 12182(b)(2)(A)(iv), and, "where removal of a barrier is not readily achievable, a failure to make such goods, services, facilities . . . or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v). With less than geometric precision, the statute defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). See also 28 C.F.R. § 36.304(a). One of the listed means of overcoming a barrier is the installation of a ramp, 28 C.F.R. §

19

36.304(b)(1), but a portable, or temporary, ramp is permitted only "when installation of a permanent ramp is not readily achievable." 28 C.F.R. § 36.304(e).

The statute contains a separate set of requirements that apply to so-called "new construction" -- defined as a building designed for first occupancy beginning January 26, 1993 or later -- and also to existing buildings that undergo "alterations". 42 U.S.C. § 12183(a). For each of these categories, the cited provision defines the term "discrimination" in a somewhat different manner. Thus for new construction, discrimination consists of "a failure to design and construct facilities . . . that are readily accessible to and usable by individuals with disabilities" unless "the entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this sub-chapter." 42 U.S.C. § 12183(a)(1).

As for "alterations", the provision states that "discrimination . . . includes,

with respect to a facility or part thereof that is
altered by or for the use of an establishment in a
manner that affects or could affect the usability of
the facility or part thereof, a failure to make
alterations in such a manner that, to the maximum
extent feasible, the altered portions of the
facility are readily accessible to and usable by
individuals with disabilities, including individuals
who use wheelchairs.

42 U.S.C. § 12183(a)(2) (emphasis added).[2]

The determination whether a facility has undergone an
"alteration" involves a fact-specific inquiry centered on a
broad application of the concept of "usability". See Roberts,
542 F.3d at 369 (quoting Final Rule, Nondiscrimination on the
Basis of Disability by Public Accommodations and in Commercial
Facilities ("Title III Final Rule"), 56 Fed. Reg. 35,544, 35,581
(1991)("any change that affects the usability of the facility,
not simply changes that related directed to access by

_____

[2] This same provision -- in a portion not applicable in this
lawsuit because the relevant claims have been dropped -- further
notes that when an alteration "affects or could affect usability
of or access to an area of the facility containing a primary
function, the entity shall also make the alterations in such a
manner that, to the maximum extent feasible, the path of travel
to the altered area . . . [is] readily accessible and usable
by individuals with disabilities where such alterations to the
path of travel . . . are not disproportionate to the overall
alterations in terms of cost or scope (as determined under
criteria established by the Attorney General)." Id. See also
Roberts, 542 F.3d at 368.

individuals with disabilities"). As the Second Circuit has noted, changes affecting usability frequently occur when the changes are major, id., and it cited as non-exclusive but potentially pertinent criteria (1) "[t]he overall cost of the modification relative to the size . . . of the facility", (2) "[t]he scope of the modification", (3) "[t]he reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose of function of the facility)", and (4) "[w]hether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty." Id. at 370. That said, the Court went on to observe that "[e]ven a relatively inexpensive or localized modification may . . . so fundamentally change the use of a facility that we would regard it as an alteration, particularly if it affects the purpose, function, or underlying structure of the facility." Id.

A determination that a facility has undergone an "alteration" has considerable significance with respect to the substance of the applicable legal standard. If the facility predated 1993 and has not undergone an alteration, the test is whether a proposed remedial step is readily achievable. The

22

plaintiff must "articulate a plausible proposal for barrier removal, 'the costs of which, facially, do not clearly exceed its benefits.'" Roberts, 542 F.3d at 373. The plaintiff's initial proffer on estimates and the proposal itself need not be "exact or detailed", but the defendant must then demonstrate "that the costs of a plaintiff's proposal would in fact exceed its benefits. Because the concept of 'readily achievable is a broad one, either party may include in its analysis, as costs and benefits, both monetary and non-monetary considerations." Id.

     The liability analysis for a facility that has undergone an alteration is significantly different. As noted, the statute requires the property owner to ensure that the facility has been made "accessible and usable to disabled individuals to the 'maximum extent feasible.'" Roberts, 542 F.3d at 371 (citing 42 U.S.C. § 12183(a)(2)). The pertinent DOJ regulation, in explaining the term "to the maximum extent feasible", states as follows:

     The phrase "to the maximum extent feasible" . . .
     applies to the occasional case where the nature of
     an existing facility makes it virtually impossible
     to comply fully with applicable accessibility
     standards through a planned alteration. In these

circumstances, the alteration shall provide the
maximum physical accessibility feasible. Any altered
features of the facility that can be made accessible
shall be made accessible. If providing accessibility
in conformance with this section to individuals with
certain disabilities (e.g., those who use
wheelchairs) would not be feasible, the facility
shall be made accessible to persons with other types
of disabilities (e.g., those who use crutches, those
who have impaired vision or hearing, or those who
have other impairments).

28 C.F.R. § 36.402(c). As the Second Circuit has emphasized,

[28 U.S.C.] Section 12183's "maximum extent
feasible" requirement does not ask the court to make
a judgment involving costs and benefits. Instead, it
requires accessibility except where providing it
would be "virtually impossible" in light of the
"nature of an existing facility." The statute and
regulations require that such facilities be made
accessible even if the cost of doing so -- financial
and otherwise -- is high.

Only if there is some characteristic of the facility
itself that makes accessibility "virtually
impossible," then, may the provision of access be
excused.

Roberts, 542 F.3d at 371-72.

The court must assess feasibility "with respect to the
state of the facility before the alterations in question were
made, rather than the facility's post-alteration state." Id. at
372. The accessibility guidelines promulgated by the DOJ also
emphasize that "no alteration shall be undertaken which

24

decreases or has the effect of decreasing accessibility or usability of a building or facility below the requirements for new construction at the time of alteration." ADA Accessibility Guidelines ("ADAAG") § 4.1.6(1)(a), also found at 28 C.F.R. Pt. 36, App. A. [3]

As for the respective burdens of proof, the plaintiff bears a burden that is "not heavy", see Roberts, 542 F.3d. at 372 (adopting analysis from Borkowski v. Valley Central School Dist., 63 F.3d 131, 138 (2d Cir. 1995)), but she must initially "identify[] some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs.'" Id. at 372. If plaintiff does so, "the defendant

---

[3] The DOJ promulgated the ADAAG pursuant to a statutory delegation of regulatory authority for Title III of the ADA and its mandate that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation." Meineker v. Hoyts Cinemas Corp., 69 F. App'x 19, 21 (2d Cir. 2003)(quoting 42 U.S.C. § 12182(a)). The Guidelines were updated in 2010, but incorporated the same language requiring alterations not to limit access. "ADA Standards," United States Access Board, https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/ada-standards (last visited July 27, 2015).

then bears the burden of persuading the factfinder that the plaintiff's proposal would be 'virtually impossible' in light of the 'nature of the facility.'" Id. (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).[4]

The regulations also refer to the special circumstances of facilities undergoing an alteration that either are "eligible for listing in the National Registry of Historic Places under the National Historic Preservation Act (16 U.S.C. 470 et seq.) or are designated as historic under State or local law . . . ." 28 C.F.R. § 36.405(a). Those facilities must "comply to the maximum extent feasible with this part." Id. The regulation goes on to say that "if it is determined that it is not feasible to provide physical access to an historic property . . . in a manner that will not threaten or destroy the historic significance of the building or facility, alternative methods of access shall be provided pursuant to the requirements of subpart C of this part." 28 C.F.R. § 36.405(b). Subpart C in turn

---

[4] If the lack of accessibility concerns the so-called "path of travel", any proposal for correction of a lack of access must also look to the potential cost, even in an altered facility. See id. (discussing 42 U.S.C. § 12183(b)). That requirement appears to refer to interior obstacles, which are no longer at issue in this case.

26

addresses requirements for existing facilities that have not been subject to alterations, that is, they must remove barriers if "such removal is readily achievable", 28 C.F.R. 36.304(a), and if such removal (for example by use of a ramp) is not readily achievable, it must use "alternative methods" that are readily achievable. 28 C.F.R. § 36.305(a) & (b) (mentioning, inter alia, "curb service").

The reference in 28 C.F.R. § 36.405(b) to a "determination" of an adverse impact on "historic significance" appears to contemplate a requirement that the property owner consult the "State Historic Preservation officer or Advisory Council on Historic Preservation". See 2010 ADA Standards for Accessible Design 202.5 & Advisory 202.5.[5] As noted in the Advisory, the

---

[5] Section 4.1.7(2)(d) of the ADAAG specifies that in cases where local preservation authority has been delegated by the State Historic Preservation Officer to a "Certified Local Government" authority, that local authority is charged to consult with defendant and issue a determination. Here, the New York State Historic Preservation Officer has delegated the authority described by ADAAG § 4.1.7 to the New York City Landmarks Preservation Commission. See New York State Parks, Recreation and Historic Preservation, "Historic Preservation Office:    Certified    Local    Governments" http://nysparks.com/shpo/certified-local-governments/    & "Certified Local Government Program in New York State," http://nysparks.com/shpo/certified-local-governments/documents/CLGIntroductoryPacketRegulations.pdf at 25

regulations contain exceptions to the access requirements for various elements of an historic structure -- including for entrances -- and if the State officer agrees that compliance with the otherwise applicable requirements "would threaten or destroy the historic significance of the building or facility", then the cited exception (in this instance, id. 206.4, Exception 2) would apply. See also 56 Fed. Reg. 35,694 (July 26, 1991).[6]

---

(last visited July 30, 2015)(explaining the state's participation in the delegation program & identifying the LPC as the Certified Local Government for historic preservation in New York City).

[6] In releasing the final rules in 1991, the DOJ explained that accessibility to historic properties would be necessary except in "very rare situations in which it is not possible to provide access to an historic property using the special access provisions established by [Uniform Federal Accessibility Standards] and ADAAG." 56 Fed. Reg. 35,694 (July 26, 1991). Historic properties that have been altered must first attempt to achieve accessibility to the "maximum extent feasible" and only if that is not feasible, may they apply the lesser, "readily achievable" standard for unaltered facilities. Id. ("Therefore, paragraph (d)(1) of § 35.151 has been revised to clearly state that alterations to historic properties shall comply, to the maximum extent feasible, with section 4.1.7 of UFAS or section 4.1.7 of ADAAG. Paragraph (d)(2) has been revised to provide that, if it has been determined under the procedures established in UFAS and ADAAG that it is not feasible to provide physical access to an historic property in a manner that will not threaten or destroy the historic significance of the property, alternative methods of access shall be provided pursuant to the requirements of § 35.150.")(emphasis added).

28

## C. **Was Unit 1B Subject to an Alteration? If So, What is the Consequence?**

The parties dispute whether the property at 597 Broadway underwent an alteration in 2009. Since that determination significantly impacts the analysis of the parties' evidentiary showings, we first address that question. On the current record, there is no meaningful dispute as to the events pertinent to this issue, and accordingly we treat it as amounting to a pure question of law.

The allocated burdens of proof on whether an alteration has been made derive from the Second Circuit's decision in Borkowski v. Valley Central School Dist., 63 F.3d 131 (2d Cir. 1995), which assessed the burdens of proof with respect to demonstrating a "reasonable accommodation" under the Rehabilitation Act, 29 U.S.C. § 794. Drawing from that decision the point that defendants have "superior access to information regarding their own facilities", the Second Circuit in Roberts held that the plaintiff bore only an initial burden of production -- referred to as "not heavy" -- to "identify[] a modification to a facility and mak[e] a facially plausible demonstration that the modification is an alteration under the ADA. The defendant then bears the burden of persuasion that the

29

modification is in fact not an alteration." Roberts, 542 F.3d at 371 (quoting in part Borkowski, 63 F.3d at 138). As the Court then noted, "If we determine that a particular modification is an alteration under the ADA, we must then decide whether the alteration was made readily accessible and usable to disabled individuals to the 'maximum extent feasible.'" Id. (quoting 42 U.S.C. § 12183(a)(2)).

We conclude as a matter of law that the closing of the openings in the party wall in 2009 amounted to an alteration under the ADA. This conclusion follows from the wording of the pertinent regulation and additional explanations found in the Federal Register addressing both the statute and the DOJ regulations issued under the ADA.

As broadly defined by the regulations, "an alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b). The cited regulation goes on to state that

> [a]lterations include, but are not limited to,
> remodeling, renovation, rehabilitation,
> reconstruction, historic restoration, changes or

30

rearrangements in structural parts or elements, and
changes or rearrangements in the plan configuration
of walls and full-height partitions.

Id. § 36.402(b)(1). In contrast "normal maintenance, reroofing,
painting or wallpapering, asbestos removal or changes to
mechanical or electrical systems" are not deemed to constitute
alterations. Id.

Of particular note, the regulation hinges the definition of
"alteration" on the notion that it involves a change that
affects "usability". That this concept was intended to sweep
broadly is confirmed by the Federal Register explanation:

Paragraph (b) provides that, for purposes of this
part, an "alteration" is a change to a place of
public accommodation or a commercial facility that
affects or could affect the usability of the
building or facility or part thereof. One commenter
suggested that the concept of usability should apply
only to those changes that affect access by persons
with disabilities. The Department remains convinced
that the Act requires the concept of "usability" to
be read broadly to include any change that affects
the usability of the facility, not simply changes
that relate directly to access by individuals with
disabilities.

56 Fed. Reg. at 35,581.

31

The 2009 closure of the three party-wall openings on the ground floor of the premises plainly meets this set of requirements. Prior to that modification, the retail unit at 597 Broadway functioned as one part of a larger commercial space, encompassing as well the unit at 595 Broadway. Following the closure, unit 1B functioned as a stand-alone commercial space. That event plainly reflects a change in the "usability" of the space, and that alone should suffice to qualify the closure as an alteration. As the Second Circuit observed in Roberts, "[e]ven a relatively inexpensive or localized modification may . . . so fundamentally change the use of a facility that we would regard it as an alteration. . . ." 542 F.3d at 370. Indeed, among the examples mentioned in the regulations are changes in the configuration of walls, see 28 C.F.R. § 36.402(b)(1), and this certainly meets that test. Furthermore, we note that the same regulation offers a set of distinguishing examples of modifications that do not amount to alterations, and all of them concern either purely surface improvements -- such as reroofing, painting and wallpapering -- or other changes that do not affect structure or function. See also Roberts, 542 F.3d at 370 (distinguishing between changes that affect structure or function and changes that affect only surfaces); Rodriguez v.

32

Barrita, Inc., 2014 WL 31739, *23 (N.D. Cal. Jan. 3, 2014),
reconsid. denied, 2014 WL 282655 (N.D. Cal. Jan. 24, 2014);
Davis v. John S. Ciborowski Family Trust, 2013 WL 1410007, *3
(D.N.H. April 8, 2013). Indeed, the wall closure in this case
qualifies even under the proposed narrower definition of
alteration discussed in the Federal Register and rejected there.
As noted, that more limited reading would apply the alteration
standards only to changes that affected access, but the change
wrought in 2009, by closing off the 1B unit from 595 Broadway,
directly affected access to defendant's space by eliminating it
for all wheelchair-bound persons, in violation of the ADAAG §
4.1.6(1)(a).

     In resisting this conclusion, defendant appears to argue
that the closure cannot be an alteration, or at least not one
that compels an accommodation at the entrance to the store,
because the pertinent test looks only to the element altered --
in this case the party wall -- and hence any accommodation (if
one were possible) would involve that party wall. (Def. Reply
Mem. 10). This analysis is a non-starter.

     The basic regulation governing alterations states that "any
alteration . . . shall be made so as to ensure that, to the
33

maximum extent feasible, the altered portions of the facility are readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs." 28 C.F.R. § 36.402. The reference to "the altered portions of the facility" plainly refers, in this case, to the retail space at unit 1B, not merely to the party wall. Indeed, a contrary reading would lead to one of two perverse results. Under one scenario, the owner would be precluded from closing the party wall under any circumstances because the "altered portion" would be co-extensive solely with that wall, and closing the wall could not be done while assuring that access through that same wall would be preserved or enhanced. Alternatively, if it were assumed that under the regulation the owner was still free to close the wall, he could do so and thereby cut off all wheelchair access to the premises despite the stated regulatory requirement that alterations be accompanied by the assurance of maximum feasible access for disabled individuals.

The regulatory language and intent (as stated both in the regulation and in the Federal Register explanation) dictate that we view the term "altered portions" in a functional manner. Thus, in this case the altered portion must be the retail space

34

in unit 1B, since it was fundamentally altered in two respects.
First, as noted, it was severed from the retail space at 595
Broadway and thus became a smaller, free-standing space. Second,
the pre-existing two street entrances to the 1B space were
reduced to one, with the further effect of eliminating
wheelchair access. This reading and application of the
regulations is fully consistent with the purpose of regulating
alterations under the ADA -- that is, to ensure that structural
changes to a pre-existing space enhance, rather than diminish,
access for disabled individuals.

In sum, the closure of the party wall in 2009 constituted
an alteration under the statute and regulations.

As for the consequence of that determination, the defendant
was obliged in 2009 to ensure continued access to the maximum
extent feasible. In terms of its burden in this lawsuit, it
cannot defeat facially plausible proposals for doing so absent
evidence that the proposed accommodation would be virtually
impossible. Roberts, 542 F.3d at 371-72 (citing 28 C.F.R. §
36.402(c)). In addition, since the 2009 alteration closed off
access to unit 1B for wheelchair-bound individuals, it follows
that at the time, and at least until the provision of a portable

ramp, defendant was in violation of the ADAAG § 4.1.6(a)(1), which provided that "[n]o alteration shall be undertaken which decreases or has the effect of decreasing accessibility or usability of a building or facility below the requirements for new construction at the time of alteration."[7]

## D. Assessment of the Defendant's Motion

### 1. The ADA Claims

Defendant has moved for summary judgment. In doing so, it contends that (1) the closure of the party wall was not an alteration, (2) that the determinative question is therefore whether any accommodation beyond a temporary ramp is "readily achievable", and (3) that no such further accommodation -- specifically, in the form of a permanent ramp -- is in fact "readily achievable". For that last proposition, defendant cites the testimony of its architect, Mr. van den Bout, and the fact that his ramp design, while ADA compliant, triggered objections

---

[7] The quoted 1991 guidelines were superceded in 2010 by a new set of standards, which reiterated the quoted requirements. See ADAAG 202.3.1 ("Prohibited Reduction in Access. An alteration that decreases or has the effect of decreasing the accessibility of a building or facility below the requirements for new construction at the time of the alteration is prohibited.").

36

from the DOB, one of which was, in his view, not remediable.[8] In short, the linchpin of defendant's argument is the assumption

---

[8] Plaintiff seeks to preclude consideration of some or all of Mr. van den Bout's testimony about the prospects for approval of his submitted design, on a variety of grounds, all specious. She asserts (1) that he is not an expert on the ADA, (2) that he is not an expert on whether the DOB or DOT would approve an application, (3) that he does not rely on any methodology in arriving at his opinions, (4) that he has offered no statistical basis for his opinions about the probability of agency approval, (5) that he never communicated with the DOT or the LPC about his design, (6) that he has provided opinions based only on his general experience, (7) that his opinions are not the product of any reliable method, and (8) that he has not reliably applied any principles and methods to the facts of the case. (Pl. Oppos. 2-10). She also argues that his declaration should be precluded insofar as it contradicts his deposition testimony, thus invoking the "sham issue of fact" rule. See, e.g., In re Fosamax Prods. Liability Litig., 707 F.3d 189, 193 (2d Cir. 2013)(citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).

Mr. Van Den Bout provides testimony on two subjects. First, as a fact witness he reports on his design of a permanent ramp and his interactions with the DOB following its submission to that agency. Second, as an expert he explains the required procedures and substantive requirements for approval of such designs, opines on the prospects for approval of such an application in view of the pertinent substantive requirements for obtaining approval, and explains what adjustments would be needed to his proposed design to satisfy various regulatory criteria, and the impact of such alterations on compliance with other governing technical requirements. (See generally VDB R. 56 Decl.; VDB Oppos. Decl.). He does not purport to be an expert on the ADA, and he does not offer scientific information that might require the use of peer-reviewed methodologies. Instead, he offers information not readily accessible to a lay finder of fact, and bases that testimony on his experience dealing with the DOB and DOT on comparable projects. As a licensed architect and owner of his own firm specializing for more than 20 years in

37

New York City landmarked properties, he has substantial experience working with the design standards and regulations related to such properties here. (VDB R. 56 Decl. ¶¶ 1, 3-7 & Ex. A; Def. 56.1 St. ¶¶ 34-37). Since his testimony on these topics is derived from his extensive knowledge of DOB, DOT and LPC procedures and standards, his experience with permit applications and his expertise regarding design interventions for properties covered by the City's Landmark Law, there is ample basis for his expert opinions. <u>See</u>, <u>e.g.</u>, <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 153 (1999); <u>Am. Home Assurance Co. v. Merck & Co.</u>, 462 F. Supp. 2d 435, 451 (S.D.N.Y Oct. 26, 2006). <u>See also</u> <u>United States v. Romano et al.</u>, - F.3d. -, 2015 WL 4509078, *10 (2d Cir. July 27, 2015)(recognizing that experts bring many types of expertise, including those derived from personal knowledge or experience, and that they may testify on subjects that are not scientific).

As for his predictive opinions about the likely fate of various proposals, we recognize them to be just that, predictions, but given his experience and knowledge of the regulations, he is qualified to offer them, with the caveat that the cited rules specify certain issues as to which the various agencies are afforded discretion. Thus, we read his testimony in that respect as offering general predictive assessments as to how an agency may exercise such discretion as it may have.

Finally, insofar as plaintiff asserts that Mr. van den Bout's declaration contradicts his deposition testimony, the doctrine that plaintiff cites provides for preclusion of summary-judgment declarations only if they directly contradict the declarant's prior testimony. <u>See</u>, <u>e.g.</u>, <u>In re Fosamax Products Liab. Litig.</u>, 707 F.3d at 194 (the "sham issue of fact" doctrine involves "real, unequivocal, and inescapable contradictions") (internal quotation omitted). In this case there is no such contradiction. (<u>Compare</u> VDB R. 56 Decl. ¶ 22 ("I believe the ramps have virtually no chance of being approved by the DOB or LPC") <u>with</u> Parker Support Decl. Ex. 16 at 118-21(explaining that Mr. van den Bout does not provide guarantees or percentage probabilities that a design will gain DOB approval)).

that a ramp that extends well beyond the 44-inch limit on a fairly narrow sidewalk cannot obtain municipal approval.

In opposing defendant's motion, plaintiff invokes the more rigorous standard -- virtual impossibility -- which is applicable to alterations. She further notes that the test of whether an accommodation for a more extended ramp in the current setting is "virtually impossible" turns in large measure on whether the DOT would agree to a revocable consent for the ramp designed by Mr. van den Bout. She then argues that such a determination cannot be made absent an application by defendant to the DOT for a revocable consent. (Pl. Support Mem. 21-27). Plaintiff also refers to two other forms of accommodation that might be acceptable. One is a ramp designed by plaintiff's consultant, although that ramp is concededly less compliant with municipal requirements than is the design proffered by Mr. van den Bout. (See VDB Oppos. Decl. ¶¶ 22-33 & Ex. F-I; Parker Support Decl. Ex. 10 at 3-4). The other is in the form of a proposal for a lift, the outlines of which she proffers through

39

her unlicensed architectural consultant. (VDB Oppos. Decl. ¶¶ 30-33 & Ex. H-I).[9]

The initial problem with defendant's motion is that it rests on a legal premise that is unsustainable on the current record -- that the closing of the party wall was not an alteration. If that were the case, plaintiff would bear the burden of demonstrating that installation of the permanent ramp was "readily achievable", a far more difficult test than the standard attached to facilities that have undergone an "alteration." That said, we nonetheless address defendant's motion by undertaking an assessment of the record, while applying the proper test of "virtual impossibility".

Plaintiff met her initial, modest burden by demonstrating that defendant had not complied with the ADA when it arranged for the party wall to be closed and by proffering three proposals for overcoming the architectural barrier, including the defendant's own ADA-compliant proposed permanent ramp as a

---

[9] Although plaintiff suggests, on her own motion, that defendant could have requested from the other interested parties consent to keep the party wall open, (Pl. Support Mem. 14), neither side raises that prospect in connection with defendant's motion.

40

feasible and appropriate remedy. See, e.g., Roberts, 542 F.3d at 375. Thus the burden shifted to defendant to demonstrate that the alterations and the later use of a temporary ramp gave access "to the maximum extent feasible", a burden that demanded proof that a proposed permanent ramp or other proffered alternative was "'virtually impossible' in light of the 'nature' of the facility . . . ." Id. (quoting 28 C.F.R. § 36.402(c)). Moreover, in the context of defendant's summary-judgment motion we must then determine whether defendant has demonstrated beyond triable dispute that each alternative proposed by plaintiff is virtually impossible to achieve.

### a. Defendant's Ramp Proposal

We start with Mr. van den Bout's ramp proposal, which plaintiff has invoked as her preferred accommodation. Ultimately, we conclude that while plaintiff succeeds in carrying her required initial burden under the Borkowski standard, defendant has carried its burden to demonstrate, beyond triable dispute, that approval of that ramp would be virtually impossible.

41

In seeking to carry its burden, defendant proffers as the most pertinent facts the following: (1) Its architect submitted his ramp proposal to the DOB. (VDB R. 56 Decl. ¶ 16 & Ex.D). (2) The proposal, while consistent with the ADA and municipal slope requirements, compels the ramp to extend far beyond the 44-inch municipal limit on extrusions onto the sidewalk from the building line. (Id. ¶¶ 17-19 & Ex. E). (3) The proposed ramp lacked handrails, and altering it to include handrails would increase the degree to which it exceeded the 44-inch limitation. (Id. ¶ 20 & Ex. E). (4). The DOB then communicated its objections to the proposal, including its observation that the proposed ramp exceeded the 44-inch limit and that it lacked handrails. (Id. ¶¶ 19-20 & Ex. E). (5) The DOB has no authority to excuse the violation of the 44-inch requirement, although the DOT may do so by way of a revocable consent. (Id. ¶ 15). (6) The DOT has a set of requirements that preclude a revocable consent when the proposed ramp would come within less than three feet of a manhole cover or block more than half the sidewalk or leave less than eight feet of clearance on the sidewalk. (VDB Supplemental Decl. ¶¶ 3, 8 & Ex. A at §§ 7-06(c)(5)(i), 7-06(c)(3)). (7) The proposed ramp, while compliant with ADA and municipal slope requirements, unavoidably violates the DOT rules

42

against blocking more than half the sidewalk or leaving less than eight feet of clearance and against intruding on the utility hole covers on the sidewalk. (Id. ¶ 10 & Ex. A, R.N.Y.C. tit. 34 § 7-06(c)(5)(i)). (8) Avoidance of the manhole-cover problem would compel a modification of the ramp by radically increasing the slope from the permitted 1:10 ratio to as much as 1:3 or 1:4. (Id. at ¶¶ 4-10). (9) Such a proposed slope would so substantially exceed both ADA and City limits as to virtually guarantee a rejection by the DOT, which may only waive such a requirement if the applicant demonstrates "undue hardship". (Id. ¶¶ 10, 16 & Ex. A at 7-06(d)(1)).

Defendant's proffer meets its burden of demonstrating the virtual impossibility of plaintiff's proposal, subject to whether plaintiff can establish triable issues of fact on that question.[10] In seeking to do so with respect to the proposed ramp, plaintiff points to the conceded fact that the DOT may approve a structure that exceeds the 44-inch limit. (See June

---

[10] The DOJ's explanation of the governing rules refers to technical infeasibility, 56 Fed. Reg. at 35,581, which we infer encompasses the need for approval by local governmental authorities. See, e.g., Kreisler v. Second Avenue Diner, 2012 WL 3961304, *8-9 (S.D.N.Y. Sept. 11, 2012)(assessing prospects for DOT approval of ramp as exception to sidewalk structure rules), aff'd, 731 F.3d 184 (2d Cir. 2013).

29, 2015 letter from Glen H. Parker, Esq., Doc. 79, at 2 (citing R.N.Y.C. tit. 34 § 7-04(a)(23)). Plaintiff further offers the legal argument that defendant is obliged "to apply for a variance" unless it can demonstrate that such an application would be "futile". (Id.)(citing inter alia Sunrise Detox V, LLC v. City of White Plains, 769 F.3d 118, 124 (2d Cir. 2014); Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 349 (2d Cir. 2005)). According to plaintiff, defendant fails to demonstrate such futility, which requires showing that the agency lacks discretion to grant a variance or that it "has dug in its heels and made clear that all such applications will be denied." (Id.)(quoting Sunrise Detox, 769 F.3d at 124).

We conclude that plaintiff fails to demonstrate a triable issue of fact with respect to defendant's showing regarding the proposed permanent ramp. The weakness of plaintiff's case in this respect encompasses both a failure to demonstrate a triable factual issue and a misguided attempt to impose an administrative-exhaustion requirement that is wrenched from a different and inapplicable legal context.

As noted, there is no dispute that the DOT has the discretion to excuse a failure to comply with the 44-inch limit

44

on structures that extend from the building line onto the
sidewalk. Indeed, that discretion is embodied in the Rules of
the City of New York that defendant proffers through the
supplemental declaration of Mr. van den Bout. (See VDB
Supplemental Decl. Ex. A, R.N.Y.C. tit. 34 § 7-04(a)(23)). That
provision states that "[t]he Department may grant a revocable
consent for a ramp which extends more than 44 inches from the
building line for buildings erected prior to December 6, 1969,
including any additional steps attached or ancillary to the ramp
structure made necessary by the creation of the ramp." This
provision explicitly references section 27-308 of the
Administrative Code, which allows ramps to extend up to 44
inches beyond the building line. (See id.).[11]

Plaintiff fails, however, to address the fact that the very
rules that she cites impose a set of specific restrictions on
the discretion of the DOT to authorize a non-conforming ramp. As
cited by Mr. van den Bout, under the heading of "General

---

[11] Section 27-308(a) states that "[w]hen a building erected
prior to December sixth, nineteen hundred sixty-nine is altered
to provide access to individuals who use wheelchairs, ramps
constructed to provide such access may, with the approval of the
commissioner, project beyond the street line for a distance of
not more than forty-four inches." (See VDB Supplemental Decl.
Ex. A at p. 41).

Conditions" (see id. Ex. A at § 7-06), those rules specify the
following:

> (3) Clear path. A straight and unobstructed path
> ("clear path") for pedestrian circulation on the
> sidewalk shall remain after the installation of the
> improvement. The minimum width of the clear path
> shall be the greater of eight feet or one-half of
> the sidewalk width.
>
> .      .      .      .
>
> (5)(i) The following minimum distances shall be
> required between the revocable improvement and the
> specified element or object, except as otherwise
> specified herein.
>
> .      .      .      .
>
> Utility Hole Covers, Cellar Doors, Areaways 3'

(Ex. A at § 7-06(3) & (5)(i)).

It is plain from the terms of the cited rules that these
requirements are intended to limit the scope of the DOT's
discretion to grant a revocable consent for a structure that
would extend more than 44 inches from the building line. Thus,
plaintiff's invocation of that discretion does not undermine
defendant's showing in any respect.

It does bear mention that the NYC rules do contain one
provision -- not cited by plaintiff -- that grants the DOT some

46

apparently very limited discretion to loosen the rules governing
revocable consents. That provision states as follows:

(d) Waiver.

(1) Where strict compliance with these rules
shall create undue hardship, the Commissioner may
waive or modify these rules, in specific cases,
except where prohibited by law, if in his/her
opinion, the public health, safety and general
welfare will not be endangered thereby. The
petitioner shall request such waiver in writing and
shall provide any information requested by the
Department which may assist the Commissioner in his
or her determination.

(2) Notwithstanding the above provisions, prior
to waiving the standard rules related to the
location or dimensions of improvements, the
Department shall refer the proposed change to [the
Department of City Planning].

(Id. Ex. A, R.N.Y.C. tit. 34 § 7-06(d)(1) & (2)).

Plaintiff does not refer to this provision in its response
to defendant's supplemental showing, and, in any event, even if
we take specific account of this provision, it does not change
the result. A review of the record reflects that plaintiff has
not sought in any meaningful way to create a triable issue of
fact with respect to defendant's showing of virtual
impossibility regarding the proposed ramp. As noted, the waiver

47

provision requires, at a minimum, a showing by the applicant that enforcement of the governing rules on revocable consents would cause "undue hardship", and the DOT and Department of City Planning must further agree that allowing the waiver would not endanger "the public health, safety and general welfare." At a minimum, for plaintiff to demonstrate a triable issue with respect to the prospects for a revocable consent and waiver of the governing requirements, she would have to proffer some information that would at least suggest a colorable basis for defendant to satisfy the waiver criteria. She has utterly failed, however, to do so.

Defendant's proposed ramp would not only approach the manhole cover, but would cover it. In addition, it would block far more than half the width of the already narrow sidewalk and leave far less than eight feet of passageway. (VDB Supplemental Decl. ¶ 8; VDB R. 56 Decl. Ex. D). Plainly both conditions would almost certainly be found inconsistent with public health and safety. Moreover, plaintiff's silence on this issue reinforces the fact that there is nothing in the record to support an argument that defendant would be required to make to the DOT to the effect that enforcing these requirements would cause "undue

48

hardship". Although the record is silent as to how the DOT and the City Planning Commission have interpreted this term, given the fact that the defendant's space is already equipped with a portable ramp, one must strain to imagine a viable hardship argument, and plaintiff here offers none.

Finally, as is outlined in Mr. van den Bout's supplemental declaration, avoidance of the manhole cover would require a redesign of the ramp to incorporate a far steeper slope than is permitted by either the ADA or City rules. (VDB Supplemental Decl. ¶¶ 5-7). That representation, which plaintiff does not contradict, underscores the fact that there is not some alternative fix that would avoid the violation of the City rules requirements and yet pass muster under either federal or local law.

In seeking to avoid the conclusion that a permanent ramp installation is virtually impossible, plaintiff tries a different tack, arguing that defendant must pursue such an application through all available administrative steps unless it can demonstrate that such an endeavor would be futile, and asserting that defendant cannot make such a showing. (June 29, 2015 Parker letter at 2-4). In outlining what must be proven in

49

order to avoid what amounts to a requirement of administrative exhaustion, plaintiff cites a line of cases derived from lawsuits challenging rulings by zoning officials. (Id.).

This argument is misguided. The cases that plaintiff cites involve lawsuits against government zoning boards or officials of those entities, in which the plaintiff seeks to have their adverse ruling judicially overturned on due-process or other legal grounds. Citing the Supreme Court's decision in Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985), the agency defendants in those cases argue, and courts have agreed, that such a challenge to a land-use regulatory decision is ordinarily not ripe for adjudication until the plaintiff has received a "final decision regarding the application of the regulations to the property at issue." Id. See, e.g., Sunrise Detox, 769 F.3d at 122. In those cases, to avoid this pre-suit exhaustion requirement, the plaintiff must point to some circumstance demonstrating either current injury or "futility", that is, that pursuit of the remaining rungs of agency procedures would inevitably yield the same adverse result -- a contention that some courts have described as dependent on a showing that the agency either lacks

50

discretion or "has dug in its heels and made clear that all such applications will be denied." Kowalczyk v. Barbarite, 594 F. App'x 690, 692 (2d Cir. Nov. 7, 2014); Murphy, 402 F.3d at 349. In explaining this ripeness requirement, the Second Circuit has observed that it tracks the Article III "case or controversy", and related standing, requirements of an actual injury. The final-decision rule "helps distinguish between those cases in which a plaintiff has suffered a 'concrete and particularized' 'actual or imminent' injury, and those in which the injury is 'merely speculative and may never occur depending on the final administrative resolution.'" Sunrise Detox, 769 F.3d at 122 (quoting inter alia Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Dougherty v. Town of North Hempstead Bd. Of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002)).

This set of requirements does not directly apply here. Defendant is not suing anyone, much less a government entity charged with land-use decision-making. Therefore defendant faces no constitutional requirement that it have standing to pursue a claim or that it demonstrate actual injury. In short, the standing and ripeness requirements are inapplicable to the defendant, and neither the ADA nor any other body of law imposes

51

an exhaustion requirement before a defendant in a case such as this may assert a defense.

As we have noted, under the ADA defendant must demonstrate that a given proposal by the plaintiff for overcoming an architectural barrier would be virtually impossible. Conceptually, that issue, as framed, parallels to a degree the futility notion from the zoning cases. That being said, plaintiff's further argument that defendant cannot demonstrate futility, however defined, unless it pursues all administrative avenues regarding a permanent ramp is plainly not correct. As we have noted, the DOT has some limited discretion, but is governed by certain specific restrictions that appear on their face to preclude approval of the proposed ramp. Moreover, as we have further noted, although the NYC rules provide a narrowly defined grant of waiver authority to the DOT in combination with the City Planning Commission, the record reflects no evidentiary basis for a trier of fact to conclude that that narrow exception would or could be applied to the ramp in question here, in view of the very stringent limitations on the exercise of that waiver authority -- specifically relating to the requirements of an undue hardship and protection of public safety. Since plaintiff

52

has offered no evidentiary basis for inferring any prospect of success for such an application, she has failed to carry her Rule 56 burden to demonstrate a triable issue of material fact.

In sum, defendant has made an adequate showing that utilizing the proposed permanent ramp in the face of specific regulatory requirements would be virtually impossible, and plaintiff has failed to create a triable issue of fact material to this proposition. Accordingly, summary judgment should be granted to defendant on this aspect of plaintiff's ADA claim.

### b. Plaintiff's Ramp Design

Insofar as plaintiff also proffered a proposed ramp created by its non-licensed consultant (see VDB Oppos. Decl. ¶¶ 22-33 & Exs F-I; Parker Support Decl. Ex. 10 at 3-4), the result is no different.[12] Indeed, as defendant has pointed out, that design

---

[12] At one point defendant argues that plaintiff's "expert witness," Mr. Zuehl, is unqualified because he is not a licensed architect or otherwise competent to submit designs to the DOB or the LPC. (Def. Mem. 18). The implication of this argument is that Mr. Zuehl is not properly treated as an expert witness, but, as defendant acknowledges, plaintiff's consultant has not offered any opinions (id.), and his only role was to design an alternate ramp, which defendant itself has introduced into evidence, with a critique by Mr. van den Bout. (VDB Oppos. Decl.

53

does not conform to ADA or municipal requirements and would extend even further across the sidewalk than would the van den Bout design. (See van den Bout Oppos. Decl. ¶¶ 23-24, 27). Additional problems identified with plaintiffs design include the lack of handrails, a slope higher than the maximum allowed under any exception to the 2010 ADAAG, and the absence of a landing by the entry, all three of which are violations under the New York building code, as well as the ADA. (Id.). Moreover, the ramp extends to the sidewalk fronting a neighboring property, and one must own the property in question to seek a permit to build on the abutting sidewalk. (Id. ¶ 27). It follows that, for reasons already noted, the record does not permit this aspect of plaintiff's ADA claim to survive.

### c. Plaintiff's Lift Proposal

Plaintiff has also proposed, as an alternative fix, the installation of a wheelchair lift. (VDB R. 56 Decl. ¶¶ 30-33 & Exs. H-I). Although plaintiff proffered a proposed design for such a lift, defendant argues that she has failed to carry her

¶¶ 23-24, 27 & Exs. F-I; VDB R. 56 Decl. Exs. F-I). Those design materials are admissible since they are not offered as expert testimony and are proffered by defendant. See, e.g., Ohler v. United States. 529 U.S. 753, 755 (2000).

initial burden because the design is not sufficiently detailed, and plaintiff has failed to demonstrate that it could earn the needed permits. (Def. Mot. 23-24). We disagree.

As noted, the Second Circuit has recognized that a plaintiff in this type of case bears a light burden in proffering a proposal for overcoming an architectural barrier, in view of the fact that the defendant is likely to have better access to the pertinent details that would show whether the proposal is at least arguably feasible or virtually impossible to accomplish. E.g., Roberts, 542 F.3d at 372-73 & n.6. In arguing for summary judgment, defendant incorrectly relies on a Tenth Circuit decision that proposes a more rigorous test for a plaintiff's initial burden, which the Second Circuit has explicitly rejected. (Def's Mem. at 24). See Roberts, 542 F.3d at 373 n.6 (rejecting test from Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I, 264 F.3d 999 (10th Cir. 2001)).[13]

---

[13] As the Roberts court observed:

This view of the plaintiff's initial burden departs somewhat from that expressed by the Tenth Circuit in Colorado Coalition [], where the court required that

Plaintiff supplied not only a conceptual drawing of a lift, but also the name of the manufacturer and the specific lift model that she was suggesting could be installed. (Wolstein Support Decl. Ex. 10 at 51-54). Indeed, the website for the "Artira" lift, made by Garaventa Lift, which was identified by plaintiff's designer in his deposition (see Wolstein Support Decl. Ex. 10 at 51), provides design specifications, a "design and planning guide", and "architect resources" to facilitate an evaluation by defendant.[14] The provision of these specifics surely satisfies plaintiff's initial burden to proffer a plausible suggestion.

Since plaintiff meets her burden and defendant does not offer evidence that would demonstrate beyond triable dispute the

> a plaintiff furnish "precise cost estimates" and "specific design" details regarding his proposed accommodation. Id. at 1009. We think that this asks too much of the typical plaintiff, particularly where defendants can so quickly dispose of non-meritorious claims by reference to their knowledge and information regarding their own facilities.

Id. at 373 n.6.

[14] Garaventa Lift, "Architect Resources for the Artia", http://www.garaventalift.com/en/products/wheelchair-lifts/inclined-platform-lifts/artira/artira-architect-resources.html (last visited July 29, 2015).

56

virtual impossibility of this proposal,[15] its motion, insofar as it targets this aspect of plaintiff's ADA claim, should be denied.

## 2. Claims Under the NYSHRL

The New York State Human Rights Law ("NYSHRL")[16] prohibits the denial of access to "the accommodations, advantages, facilities or privileges" of any place of public accommodation on the basis of a disability. N.Y. Exec. Law § 296(2)(a). The

---

[15] Defendant's expert specifically objected to plaintiff's lift proposal on the grounds that it would "dramatically alter the historic presentation of the storefront" and that, as proposed, it unlawfully blocked Fire Department access to the standpipe. (VDB R. 56 Decl. ¶¶ 32-33). However, he also stated that the proposal was not sufficiently detailed to adequately assess. (Id. at ¶ 31). That said, defendant provided no evidence regarding the relative costs and benefits, let alone the impossibility of LPC approval for such an intervention, nor did it provide any evidence regarding whether the standpipe could be moved or the lift placed differently to leave unfettered access to the standpipe. Therefore, there remain triable issues of fact on this matter.

We also note that the regulations permitted defendants to preemptively seek an advisory opinion from the appropriate historic preservation official that the proposed lift would not be approved because of its deleterious impact on the building's historic presentation, but defendant has not taken that step. See p. 27, note 5, supra.

[16] We use the collective term NYSHRL to refer to the New York State Executive Law § 296(21) and its affiliated New York State Civil Rights Law §§ 40-c, 40-d, which authorize penalties.

statute defines the term "discriminatory practice" in this respect to encompass "the refusal to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." Under these provisions, the use of an alternative method of accommodation is permitted only when removal of the barrier is "not readily achievable." Id. § 296(2)(c)(iii)-(iv). In assessing whether such removal is "readily achievable", or "easily accomplishable", the statute echoes the ADA in specifying four relevant considerations:

> (A) the nature and cost of the action needed under this subdivision;
>
> (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources or the impact otherwise of such action upon the operation of the facility;
>
> (C) the overall financial resources of the place of pubic accommodation . . .; the overall size of the business of such a place with respect to the number of its employees; the number, type and location of its facilities; and
>
> (D) the type of operation or operations of the place of public accommodation . . ., including the composition, structure and functions of the workforce of such place; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to such place.

Id. § 296(2)(d)(i). Compare 42 U.S.C. § 12181(9); 28 C.F.R. §
36.304 (stating and defining the "readily achievable" standard
applicable to unaltered existing buildings).

As a general matter, the courts have held that "[t]he
relevant portions of the NYSHRL are interpreted to be similar to
those of the ADA." Kreisler, 2012 WL 3961304 at *13. Indeed, the
Second Circuit has observed that a disability-discrimination
claim under the NYSHRL "survives or fails on the same basis as
[the parallel] ADA claim." Graves v. Finch Pruyne & Co., 457
F.3d 181, 186 n.3 (2d Cir. 2006). Accord Rodal v. Anesthesia
Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004).[17]

---

[17] Many of the cases that have reiterated this general
observation dealt with employment-discrimination claims under
the ADA, an area in which there is clearly no divergence between
State and federal law. See, e.g., Rodal, 369 F.3d at 117 n.1;
Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n.1 (2d
Cir. 2000)(citing Micari v. Trans World Airlines, Inc., 43 F.
Supp. 2d 275, 279 (E.D.N.Y. 1999); Bonitch v. Original Honey
Baked Ham Co. of the E., 34 F. Supp. 2d 154, 160 (E.D.N.Y.
1999); Doe v. Bell, 194 Misc. 2d 774, 781 n.7, 754 N.Y.S.2d 846,
852 n.7, (Sup. Ct. N.Y. Cty. 2003). When the same nostrum has
been invoked in Title III cases, it appears that those decisions
did not involve the "alteration" standard under federal law.
See, e.g., Kreisler, 2012 WL 3961304 at *13. But see Shariff v.
Radamar Meat Corp., 2014 WL 1311563, *4 (E.D.N.Y. Feb. 14,
2014), adopted as modified, 2014 WL 1311565 (E.D.N.Y. Mar. 31,
2014)(decision on a default judgment apparently based on the
terms of the state statute without reference to the ADA

Although true as a general matter, we note that in the specific context of this case, the legal standards under federal and state law diverge in one specific respect.

Under the ADA and attendant regulations, if a pre-existing facility has been subjected to an "alteration", the applicable standard looks to whether the altered portion was made "readily accessible to the maximum extent feasible", and this criterion requires a determination whether a proposed accommodation was a "virtual impossibility". 42 U.S.C. § 12183(a)(2); 28 C.F.R. § 36.402(a). In contrast, the State statute looks to whether the proposed accommodation is "readily achievable", N.Y. Exec. Law § 296(2)(c)(iii), which is adopted from federal law that governs pre-existing facilities that have not been altered.

Since the 1B unit was, as noted, altered in 2009, this case presents the atypical scenario in which the federal and State standards do not coincide.[18] We therefore examine defendant's

---

standards, but also apparently without any briefing by defendant regarding the applicability of the "alteration" standard).

[18] We did not discover cases analogous to ours, in which analysis was required for an altered facility under both the ADA and the state-law standard. New York does impose on public buildings and the New York City subway a higher standard of

60

motion, insofar as it targets plaintiff's proposed
accommodations, under the (for plaintiff) more rigorous State
criteria.

We have already determined that there are no triable
material issues with respect to whether the installation of a
permanent ramp is virtually impossible, in view of the narrow
sidewalk and location of a manhole cover, in combination with
the technical limitations imposed under the ADA and City rules.
It necessarily follows that installation of such a ramp is not
"readily achievable", as required under the State standard.

As for the proposed lift, defendant's challenge was focused
on the contention that plaintiff's proposal was insufficiently
detailed. We have already rejected that contention, and since
defendant offers no specific evidence that would demonstrate,
beyond triable dispute, the degree of difficulty that would be
encountered in pursuing this option, its motion in this respect
cannot be granted.

---

accommodation when alterations are made. See, e.g., N.Y. Pub.
Bldgs. Law § 51; N.Y. Transp. Law § 15-b.

### 3. Claims Under the NYCHRL

The NYCHRL prohibits withholding or denying access to any place of public accommodation because of an individual's "actual or perceived" disability. NYC Admin. Code § 8-107(4)(a). The law requires anyone covered by the statute to "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." Id. § 107(15)(a). See also Kreisler, 2012 WL 3961304 at *13.

The courts have recognized that the NYCHRL offers "uniquely broad" protections and may require remediation that is more extensive than the floor created by the parallel federal and State statutes. Id. at *14 (citing Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278-79 (2d Cir. 2009); N.Y.C. Local L. No. 85 § 7 (2005)). See also Williams v. N.Y.C. Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)(requiring "an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language"). As for definitive interpretations of that statute, the New York Commission on

Human Rights is the agency responsible for investigation and
adjudication of complaints brought under the NYCHRL, although
aggrieved parties are also free to pursue such claims in courts
of competent jurisdiction. NYCHRL §§ 8-105, 8-109. As a general
matter, interpretations of a statute by the agency charged with
its administration are entitled to deference from courts
applying New York law. See, e.g., Samiento v. World Yacht Inc.,
10 N.Y.3d 70, 79, 854 N.Y.S.2d 83, 88 (2008); Colt Industries,
Inc. v. New York City Dep't of Finance, 66 N.Y.2d 466, 470-471,
497 N.Y.S.2d 887, 889 (1985). We therefore look to the statutory
interpretations of the pertinent provisions found in rulings by
the Human Rights Commission. See, e.g., Acosta v. Loews Corp.,
276 A.D.2d 214, 220, 717 N.Y.S.2d 47, 51 (1st Dep't 2000);
Riverbay Corp. v. New York City Commn. on Human Rights, 2011
N.Y. Misc. LEXIS 7105, *10-12 (Sup. Ct. Bx Cty., Sept. 9,
2011)(applying Commission's interpretation of NYCHRL).

In the context of public accommodations, the Commission has
ruled that the NYCHRL requires the owner of the facility to
"make the main entrance to a building accessible unless doing so
creates an undue hardship, or is architecturally infeasible." In
the Matter of Irene Politis v. Marine Terrace Holdings, LLC et

63

al., 2012 WL 1657556, *8 (N.Y.C. Comm. Hum. Rts. April 24, 2012); In re Matter of John Rose v. Co-op City of New York d/b/a Riverbay Corp. And Vernon Cooper, 2010 WL 8625897, *2 (N.Y.C. Comm. Hum. Rts. Nov. 18, 2010), aff'd sub nom. Riverbay Corp. v. New York City Commn. on Human Rights, 2011 N.Y. Misc. LEXIS 7105 (Sup. Ct. Bx. Cty., Sept. 9, 2011). In applying this general test, we infer that architectural infeasibility looks inter alia to whether a proposed accommodation that requires agency approval can gain that approval under governing standards.[19] See, e.g., In the Matter of Irene Politis, 2012 WL 1657556 at 11-12 (articulating a rigorous standard to rebut the presumption that a proposed modification is feasible). See also p. 43 note 10 and accompanying text, supra.

This formulation leads us back to our analysis of plaintiff's ADA claim, since the pertinent test of virtual

---

[19] The Commission has offered some fairly general guidance, stating that the "architecturally infeasible" criterion does not require a defendant to show that an accommodation is "architecturally or structurally impossible to perform", though neither will "[a] showing of architectural or structural difficulty automatically suffice to meet that burden. Rather, the covered entity, at all times, has the burden to prove that any such difficulty rises to the level of undue hardship." In the Matter of Irene Politis, 2012 WL 1657556, at *10 (emphasis in original). See also In re Matter of John Rose, 2010 WL 8625897 at *3 & n.1.

impossibility is at least a reasonable surrogate for the question of infeasibility. For reasons already noted, plaintiff's proposal for a ramp -- whether in the form designed by defendant's architect or in the more sprawling version proffered by plaintiff's consultant -- is, beyond triable dispute, not feasible, since both versions would violate specific legal restrictions that, under the current circumstances and in light of the present evidentiary record, the DOT does not have the authority to ignore.

As for the proposed wheelchair lift, again for reasons discussed, defendants have not shown beyond triable dispute that such a proposal is "architecturally infeasible". Accordingly, plaintiff's NYCHRL claim premised on that proposal should survive summary judgment.

### E. Assessment of Plaintiff's Motion

#### 1. The ADA Claim

Plaintiff seeks summary judgment on her ADA claim, premising her motion on the assertion that defendant violated Title III of the ADA when it made alterations to its facility in

2009 but failed, in the course of the alterations, to make the facility accessible to the maximum extent feasible. Specifically, she argues that the opening of the party wall in 2000 created a status quo in which wheelchair-bound patrons had untrammeled access to the 597 Broadway retail space, and that the closure of the party wall in 2009, without any accommodation to ensure continued access to that space, precluded such access, in violation of the statute and regulations. (Pl. Support Mem. 11-15). She further asserts that the later introduction of a portable ramp did not satisfy the requirement of ensuring access to the maximum extent feasible. (Id. at 20-21).

In seeking to satisfy her burden to suggest a plausible intervention to achieve accessibility, plaintiff cites two types of alternatives. First, she suggests that defendant could have sought to leave the party wall open even though Kenneth Cole was withdrawing from the 597 Broadway retail space, since that step would have assured continued access for wheelchair-utilizing patrons, such as plaintiff. (Pl. Mem. at 11). Second, she suggests that the permanent ramp design proffered by defendant's architect was a potentially feasible alternative. (See Parker

66

Support Decl. Ex. 10; Pl. R. 56 St. ¶¶ 33-36; Pl. Support Mem. 21-27).[20]

For reasons already noted, the proposed ramp is clearly in violation of specific legal requirements regarding blockage of pedestrian sidewalk traffic and non-interference with utility hole covers, and plaintiff has not proffered evidence that would create a triable issue as to whether the DOT and City Planning Commission would or could excuse such violations under the narrow discretionary authority afforded to them. On that basis we have concluded that summary judgment should be granted to defendant on this aspect of plaintiff's case. See pp. 41-53,

---

[20] As mentioned in discussing defendant's motion, plaintiff has also proffered a design for a wheelchair lift. See discussion pp. 54-56, supra. In her own initial summary-judgment motion papers, she does not allude to that proposal as a basis for Rule 56 relief, and accordingly we do not address it in assessing her motion. In any event, were we to read her motion as implicitly seeking summary judgment on that basis, we would find triable issues precluding such relief since there are evident issues as to whether such a lift could obtain approval by the DOB and especially by the LPC. (VDB R. 56 Decl. ¶¶ 30-33). See discussion pp. 54-56, supra.

We also note that at one point plaintiff proffered a ramp design by her own consultant, but she has not sought summary judgment on the basis of that design, which, as already noted, is even more non-compliant with City legal requirements than is the ramp designed by defendant's architectural expert and also fails to meet ADA standards.

supra. It necessarily follows that insofar as plaintiff seeks Rule 56 relief on this issue, that application must be denied.

We turn, then, to plaintiff's alternative contention, that defendant could have sought approval in 2009 to keep the party wall open even though Kenneth Cole was surrendering its lease to the 597 space and contracting its retail space back to the unit at 595 Broadway. Retention of an opening in the party wall, if viable, would have ensured continued wheelchair access to the 1B unit at 597 Broadway (at least during Kenneth Cole business hours), but at the same time would have required Kenneth Cole to endure the passage of strangers to its business through its retail space en route to whatever business was leasing unit 1B.

The record contains virtually no evidence as to whether defendant ever contemplated such an effort and certainly no evidence regarding the feasibility of such a scenario, much less the willingness of the other parties whose assent would have been required to agree to such an unusual arrangement. That said, we view this backward-looking proposal as sufficient to meet plaintiff's initial light burden to propose measures that would amount to a maximally feasible step to ensure access to the facility. See, e.g., Roberts, 542 F.3d at 372 (feasibility

to be assessed "with respect to the state of the facility before the alterations were made, rather than the facility's post-alteration state").

Although the plaintiff meets her initial burden on this proposal, summary judgment would be inappropriate. The relevant standard for the obligation to undertake remediation requires an assessment of feasibility. In the case of this proposal, it appears that defendant would have been required to seek and obtain approval at least from the owner of 597 Broadway and the owner of 595 Broadway, and presumably from Kenneth Cole. Whether such approval was feasible is a question that is not meaningfully addressed on the current record,[21] and thus necessarily presents a triable fact issue.[22]

---

[21] There are reasons at least to question the practicality of this proposal. Such an arrangement would have required Kenneth Cole to consent to trespasses on its retail space, with potential for substantial disruption to its business operations. In addition, with a potentially large volume of people passing through that space en route to another retail outlet, issues may well have arisen regarding liability insurance coverage. Further, any potential new lessee for the 597 Broadway space might have resisted such an arrangement depending on whether it was a competitor with Kenneth Cole or simply on the basis that it feared that access to the Kenneth Cole space would divert potential customers. All of these matters are currently and obviously in the realm of speculation, thus underscoring the

In sum, plaintiff's papers fail to justify entry of summary judgment in her favor on her ADA claim.

### 2. The NYCHRL Claim[23]

As noted, the NYCHRL looks to whether a proposed accommodation would be infeasible or cause undue hardship. In the Matter of Irene Politis, 2012 WL 1657556 at *8; In re Matter of John Rose, 2010 WL 8625897 at *2. For reasons noted, plaintiff's claim, insofar as premised on the potential availability of a permanent ramp, is subject to summary judgment for defendant. It follows that her summary-judgment motion must be denied.

---

fact that the record does not permit summary judgment for plaintiff.

[22] Defendant requested in its supplemental briefing limited, additional discovery on this issue of whether signatories to the party wall agreement would have allowed the party wall to remain open between the two spaces in 2009 or whether such a solution would be viable at present. (Wolstein Letter, Feb. 25, 2015, Doc. 70, at 1-2). We deem defendant's request to be made under Rule 56(d), which addresses the situation in which a non-moving party "cannot present facts essential to justify its opposition" to a summary-judgment motion. Since we recommend denying summary judgment to plaintiff, defendant's invocation of Rule 56(d) is unnecessary to defeat it. Whether defendant should be allowed additional discovery -- a request that plaintiff opposes -- can be addressed if and when this Report and Recommendation is adopted.

[23] Plaintiff does not seek summary judgment on her NYSHRL claim. (See Notice of Motion, Doc. 40, Nov. 21, 2014).

The other proposal that plaintiff raises in connection with her own motion is the notion that the defendant could have obtained approval to keep the party wall open (or perhaps that it could still do so). As discussed in connection with the ADA version of this claim, the record is so devoid of relevant evidence about feasibility that summary judgment must be denied.

## F. Plaintiff's Motion to Dismiss Defendant's Counterclaim

Apart from seeking summary judgment on her own claims, plaintiff requests dismissal of defendant's counterclaim. (Pl. Support Mem. 18-21). Consistent with our recommendation to deny plaintiff's summary-judgment motion on her claims, this application should also be denied.

The counterclaim mirrors defendant's response to plaintiff's claims -- all of which are premised on plaintiff's contention that a portable ramp is not a permissible accommodation under the ADA and State and local law. In response, defendant asks for a declaration that its portable ramp is compliant with legal requirements and that it is not required to construct a permanent ramp. (Answer to Am. Compl. & Counterclaim, Doc. 33, at 13-14 ¶¶ 26-32).

71

As to defendant's first proposition, whether the portable ramp represents the maximum feasible alternative depends upon final disposition of plaintiff's proposed alternative accommodations, two of which are, for reasons stated, subject to trial. As for the second proposition -- that a permanent ramp is not required -- we have found that the evidence of record demonstrates beyond triable dispute that it would be virtually impossible to obtain approval for such a ramp and, on the same basis, that obtaining such approval is not feasible.

From our analysis it necessarily follows that we cannot say definitively at this stage that defendant's use of a portable ramp violates federal, State or City law. Accordingly, it cannot be said that defendant's counterclaim is either legally insufficient or so unsupported by evidence that it may not eventually be sustained. Accordingly, this aspect of plaintiff's motion should also be denied.

## CONCLUSION

For the reasons stated, we recommend that defendants' summary-judgment motion be granted insofar as it seeks dismissal of plaintiff's claims premised on the contention that defendant

72

should be required to seek approval for installation of a permanent ramp, and that defendant's motion should otherwise be denied. We further recommend that plaintiff's motion for summary judgment be granted to the extent of finding that the closure of the party wall between 595 and 597 Broadway in 2009 was an "alteration" within the meaning of the ADA and pertinent regulations, and that the closure of that wall in 2009 violated then-applicable ADAAG § 4.1.6(a)(1) and the 2010 successor guidelines, ADAAG 202.3.1(a). In all other respects, plaintiff's motion should be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Lewis A. Kaplan, Room 2240, 500 Pearl Street, New York, New York, 10007 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and later on appeal to the United

73

States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150

(1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16

(2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a),

6(d).

**DATED: New York, New York**
       **August 4, 2015**

                              **RESPECTFULLY SUBMITTED,**

                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**

74

**Copies of the foregoing Report & Recommendation have been sent today to:**

**Adam Saul Hanski, Esq.**
**Glen Howard Parker, Esq.**
Parker Hanski LLC
40 Worth Street 10th Floor
New York, NY 10013

**Elizabeth Wolstein, Esq.**
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004